833 A.2d 563

**Edwin H. LEWIS**

v.

**DEPARTMENT OF NATURAL RESOURCES.**

**No. 114, Sept. Term, 2002.**

Court of Appeals of Maryland.

July 31, 2003.

Opinion on Reconsideration Oct. 10, 2003.

384

Raymond S. Smethurst, Jr., (Robert B. Taylor and S. James Sarbanes of Adkins, Potts & Smethurst, LLP, on brief), Salisbury, for petitioner.

Marianne D. Mason, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on brief), Annapolis, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

CATHELL, Judge.

Petitioner, Edwin H. Lewis, seeks the reversal of a decision of the Wicomico County Board of Zoning Appeals (Board) denying his request for a zoning variance to construct a hunting camp on his property located within a Critical Area Buffer. On judicial review, the Circuit Court for Wicomico County, after an October 12, 2001 hearing, upheld the decision of the Board. Petitioner appealed and the Court of Special Appeals, in an unreported opinion dated October 9, 2002, affirmed the Circuit Court's upholding of the Board's decision.

On November 25, 2002, petitioner filed a Petition for Writ of Certiorari with this Court and, on January 9, 2003, we granted the petition. *Lewis v. Department of Natural Resources,* 372 Md. 684, 814 A.2d 570 (2003). Petitioner presents three questions for our review:

"1. Did the Board err by denying Petitioner's Critical Area Buffer variance request in a decision written for it by the Critical Area Commission without considering all of the statutory factors for such a determination, by improperly construing and applying some of the factors it did consider, and by impermissibly applying the Critical Area Commission's 'cumulative impact' argument?

"2. Did the Board err in not finding Petitioner's hunting camp to be a reasonable and significant use of his property although it could not be located out of the Buffer, would occupy less than 1.5 percent of the Buffer, would not cause any environmental harm, and there was no evidence that its design or size was either inappropriate or too large for the site?

"3. Did the Board err in the decision written for it by the Critical Area Commission by then applying the criteria for an unconstitutional taking rather than the criteria for an unwarranted hardship in denying Petitioner's Buffer variance application?"

We answer in the affirmative to petitioner's questions 1 and 3, as we hold that the Board committed several errors of law in its decision denying petitioner's variance request, including not considering all of the County Code's variance criteria and misapplying the unwarranted hardship standard. Accordingly, we do not answer petitioner's question 2; we instead vacate the judgment of the Court of Special Appeals, direct that court to vacate the decision of the Circuit Court with directions to vacate the decision of the Wicomico County Board of Zoning Appeals and to remand the case to the Board to reconsider petitioner's variance request in light of our holding.

## I. Facts

### A. Critical Area Resource Protection Program Background

As we did in *White v. North,* 356 Md. 31, 736 A.2d 1072 (1999), we shall set out a brief overview of the Chesapeake Bay Critical Area Protection Program (Critical Area Program) to fully understand the nature of this case. The Critical Area Program is currently codified in Maryland Code (1973, 2000 Repl.Vol.), sections 8–1801 to 8–1817 of the Natural Resources Article. Respondent is the Department of Natural Resources (DNR), the department with the authority, through the Chairman of the Chesapeake Bay Critical Area Commission (Commission), to enforce the Critical Area Program.[1] The Commission's regulations are encompassed in Title 27 of the Code of Maryland Regulations (COMAR).

We summarized in *White:*

"It is important to understand the interrelationship between the State-imposed, but locally enforced, critical area prohibitions and local zoning requirements generally. Section 8–1802 of the Natural Resources Article provides:

'(a) *Definitions.* . . .

. . . .

(11)(i) "Project approval" means the approval of development . . . in the Chesapeake Bay Critical Area by the appropriate local approval authority.

(ii) "Project approval" includes:

. . . .

3. Issuance of variances, special exceptions, and conditional use permits. . . .'

Section 8–1808(a)(1) requires local governments to have primary responsibility for development of programs to regulate land use in the critical area, 'subject to review and approval by the Commission.' The program, '[a]t a minimum,' must include '[z]oning ordinances or regulations.'

---

1. *See* Md.Code § 8–1812 of the Natural Resources Article.

§ 8–1808(c). Pursuant to these provisions, the Commission oversees the local governments in the adoption of zoning regulations for the critical area, including variance provisions acceptable to the Commission. Once local critical area programs are adopted and approved, the programs can, depending upon their language, impose additional or different limitations. . . .

"Finally, section 8–1812 confers full standing to the Chairman of the Commission to intervene in any administrative or judicial proceeding arising out of local project approval in the critical area, subject to withdrawal if thirteen members of the Commission oppose the intervention within thirty-five days. *See North v. St. Mary's County,* 99 Md.App. 502, 508, 638 A.2d 1175, 1178 (noting that section 8–1812 confers 'unrestricted' standing upon the Commission to appeal any administrative or judicial decision impacting the Critical Area Program), *cert. denied sub nom. Enoch v. North,* 336 Md. 224, 647 A.2d 444 (1994).

"Also crucial to this case is the 'buffer' the Commission requires local jurisdictions to create. *See* COMAR 27.01.09.01.C.(1). A buffer is defined in COMAR 27.01.09.01.A as 'an existing, naturally vegetated area, or an area established in vegetation and managed to protect aquatic, wetlands, shoreline, and terrestrial environments from man-made disturbances.' The buffer must extend at least 100 feet from any tidal waterway, wetland, or tributary of the Chesapeake Bay, but localities must expand the buffer 'to include contiguous, sensitive areas, such as steep slopes . . . whose development or disturbance may impact streams, wetlands, or other aquatic environments.' COMAR 27.01.09.01.C.(1) & (7). County Code, Article 28, section 1A–104(a)(1) states: 'If there are contiguous slopes of 15% or greater, the buffer shall be expanded . . . to the top of the slope . . . and shall include all land within 50 feet of the top of the bank of steep slopes.' Within that buffer, the Commission bans any new development of all 'impervious surfaces' that are not 'water-dependent,' . . . COMAR 27.01.09.01.C.(2). The only way to build any impervious

structure ... is to apply and qualify for a variance under local zoning ordinances."

*White,* 356 Md. at 36–38, 736 A.2d at 1075–76 (footnotes omitted).

Pursuant to these previously mentioned provisions of the Maryland Code,[2] Wicomico County adopted its Critical Area Program as codified in Chapter 125 of the Wicomico County Code (County Code). That program's stated purpose, in reference to development within the Critical Area, is:

"to provide special regulatory protection for the land and water resources located within the Chesapeake Bay Critical Area in Wicomico County ... to foster more sensitive development activity for shoreline areas and to minimize the adverse impacts of development activities on water quality and natural habitats."

County Code, § 125–1.[3] The County Code specifically prohibits development inside the area known as the Buffer. County Code, § 125–9. Section 125–7 defines the "Buffer" as:

"A naturally vegetated area or vegetated area established or managed to protect aquatic, wetland shoreline and terrestrial environments from man-made disturbances. In the Critical Area District, the minimum Buffer is a contiguous area located immediately landward of tidal waters measured from the mean high-water line, tributary systems in the critical area and tidal wetlands and has a minimum width of 100 feet. The Buffer shall be expanded beyond the mini-

---

**2.** Additionally relevant is Md.Code § 8–1809(a) of the Natural Resources Article, which states:

"(a) *Statements of intent.*—Within 45 days after the criteria adopted by the Commission under § 8–1808 of this subtitle become effective, each local jurisdiction shall submit to the Commission a written statement of its intent to either:

(1) To develop a critical area protection program to control the use and development of that part of the Chesapeake Bay Critical Area located within its territorial limits; or

(2) Not to develop such a program."

**3.** Hereinafter, unless noted otherwise, all statutory references are to the Wicomico County Code.

mum depth to include certain sensitive areas as per requirements established in this chapter."

These Buffers act as a "setback" for development protecting the Chesapeake Bay's water quality. Section 125–9 of the County Code set outs Wicomico County's prohibition of development in the Buffer as it states:

"Except as provided for in § 125–18, new development activities, including clearing of existing natural vegetation, erection of structures, construction of new roads, parking areas or *other impervious surfaces* and the placement of sewage disposal systems, are not permitted in the Buffer, except as provided for in § 125–11." [Emphasis added.]

Impervious surfaces are defined as "Any man-made surface that is resistant to the penetration of water."[4] County Code § 125–7. If development does not fit the § 125–18 criteria[5] for an exception to § 125–9, the County Code allows another avenue for possible development in the Buffer; it authorizes the Board to grant variances in certain situations. *See* County Code §§ 125–35 and 36, *infra*. The Board's denial of petitioner's variance request to build part of a hunting camp in the Buffer of his property is the subject of this appeal.

### B. Lewis' Property

In April of 1999, petitioner purchased two tracts of land in Wicomico County located on opposite sides of Cross Thorofare, a tributary of the Nanticoke River, which is entirely inside the county's Chesapeake Bay Critical Area (Critical Area). The western tract of 218.78 acres is comprised entirely of marshland, while the eastern tract of 76.80 acres is comprised of 69.57 acres of marshland and 7.23 acres in "three upland areas." The largest of these "upland areas," Phillips Island, is 5.30 acres in size and is the subject of the litigation

---

**4.** Petitioner does not dispute that the roofs of his cabins fall within this definition.

**5.** Under County Code § 125–18, some "Water-dependent facilities" may be located inside the Buffer. Petitioner does not contend that his buildings fall within the definition of "Water-dependent facilities."

in the case *sub judice.* At the time of petitioner's purchase of these two tracts of land, the only man-made improvements located on the property were an old boat pier and storage building on Phillips Island[6] and 12–15 duck blinds in the western tract of marshland. Petitioner testified that he wanted to use the property just for "recreational" use. He stated, "It was [used to] spend the night. You could go out there, you could eat, spend the night, hunt early." (alteration added).

According to testimonial and photographic evidence, Phillips Island is shaped relatively like a boot. Because of the island's irregular shape, nearly the entire island, except for "three narrow, irregularly-shaped, and unconnected areas," lies within the Critical Area Buffer, as defined by the County Code.[7] In fact, 5.06 of the 5.30 acres, or 95.5 percent, of the island is within the protected Buffer. The main vegetation of the totally wooded island consists of mature oaks and loblolly pine trees. The understory,[8] except for the 20–25 feet of the Buffer closest to the marsh, is sparse with greenbriar and sassafras. According to testimony, the inland portion of the island has little ground cover, *i.e.*, shrubs, due to, in part, the tree canopy of the wooded area blocking out sunlight and limiting this type of growth.

Later in 1999, petitioner began to build a seasonal hunting camp on Phillips Island without gaining approval or permits from the County.[9] The camp consisted of, or was to consist of, six buildings: one main, 40′ × 40′ lodge with a kitchen and bath (Building 1), one 29′x 20′ bath house/restroom (Building 3), one 17′ × 18′ bunk room (Building 2), two 14′ × 16′ bunk

---

**6.** The record reflects that these structures were built long before petitioner acquired the property and are not part of this appeal.

**7.** *See supra,* for the definition of a Buffer.

**8.** The understory is defined as "a layer of vegetation beneath the main canopy of a forest." *The Oxford American College Dictionary,* 1530 (Putnam 2002).

**9.** After learning of the need for permits, petitioner ceased construction of the camp and began to confer with County officials in an attempt to obtain the necessary permits.

rooms (Buildings 4 and 5) and a 39' × 18' storage shed (Building 6). Buildings 1–5 were not built on a conventional foundation; they are supported on wood posts about two to three feet above the ground. The total "footprint" of the six buildings is 3,636 square feet.

After halting construction, petitioner commissioned a survey of the island for the purpose of ascertaining the location of his camp's buildings in relation to the Critical Area Buffer. The survey illustrated the existence of "three narrow, irregularly-shaped, and unconnected areas," totaling 10,463 square feet (4.5 percent of the island), which were the only areas of Phillips Island not located within the Buffer. Of the 10,463 square feet not located within the Buffer, 10,073 square feet was required as an area for the location of sewage disposal for the hunting camp. The County's planning staff attempted to reduce the 10,073 square foot sewage disposal area required by the State Health Department in order to make more of the non-Buffer area available for the construction of petitioner's hunting cabins. The County staff persuaded the Health Department, due in part to the hunting camp's seasonal and private use nature, to reduce the area needed for sewage disposal. Thus, petitioner received Health Department approval for a reduced sewage disposal area of 5,811.92 square feet. As a result of that reduction, the County staff suggested that petitioner move four of the six buildings from the Buffer to the non-Buffer area salvaged from the prior sewage disposal area. Petitioner then applied for a variance for a personal hunting camp with four buildings inside the non-Buffer area previously designated for part of the sewage disposal area, as suggested by the County planners, and two buildings inside the Buffer. It is uncontroverted that petitioner's use of the property for hunting purposes would be a permitted use in the agricultural rural zoning district where Phillips Island is located.

The county planning staff then suggested that petitioner employ an environmental consultant. Petitioner retained two experienced environmental consultants to assess whether his hunting camp would have adverse impacts on the surrounding

habitat and water quality.[10] Although their reasoning was somewhat different, the consultants suggested that petitioner leave all of the camp's buildings in their current location and not to relocate four buildings into the non-Buffer area salvaged from the prior sewage disposal area. They testified that placing the camp outside of the Buffer would have a greater adverse impact on the environment than leaving the buildings within the Buffer, as well as precluding that area from being used as an expanded or replacement sewage disposal area should that need arise in the future. Given these expert opinions, on October 11, 2000, petitioner modified his variance request, thereby requesting the Board to allow him to leave the buildings "where they sit." In his "Modified Site Plan For Phillips Island," petitioner did propose moving one building, the storage shed,[11] partially into the non-Buffer sewage disposal area.

## C. Board Hearing & Decision

Petitioner argues that at the Board's hearing he testified that he located the buildings in a position where he needed to remove "only two *live* trees, [and] that he had also cut 15–20 dead, diseased or falling-down trees" (alteration added). He also stated that he cleared some of the understory, mostly greenbriar, but that he left the eastern end of the island untouched, *i.e.*, he did not cut or clear that area. Petitioner additionally presented expert witness testimony regarding the island and the absence of adverse impacts on the surrounding environment if he were allowed to retain the structures as built and use them as a private personal hunting camp. One

---

**10.** Lawrence T. Whitlock, Jr., a landscape architect, environmental planner and member of the State Water Quality Advisory Committee, gathered evidence pertaining to the appropriateness of the hunting camp in its current location. Edward Launay, an expert on environmental matters, testified to matters pertaining to the possible adverse impacts the camp may have on water quality, habitat and the possible need for mitigation.

**11.** This building, the only one to be moved partially out of the Buffer, is the only building not to be supported on wood posts approximately two to three feet above the ground.

of petitioner's experts, Mr. Launay, testified that the island had many typical characteristics of islands within marshes of Wicomico County. He reasoned that these characteristics, including sparse inland understory vegetation, existed because the island is elevated, well-drained, has little nutrients reaching the understory and that the dense tree canopy blocks out sunlight to the inner areas of the island; the existence of all of these factors would likely inhibit dense understory growth.

In reference to the environmental impacts of the hunting cabins themselves, Mr. Launay performed various environmental tests and assessments to discern any adverse impacts that the cabins might have on the environment. He testified that their construction was placed to minimize any adverse impact on the forest. In fact, he said that the buildings have little, if any, adverse impact on the tree canopy. In addition, Mr. Launay testified that the type of soil on the island is of a consistency that would potentially absorb rain run-off from the rooftops of the cabins, thus minimizing the adverse environmental impact of the cabins. When asked if the building would adversely impact the quality of the surface waters abutting the island, Mr. Launay stated that he found no adverse effects.[12] He testified as to six reasons why the camp would not produce a "pollutant source," including that the construction produced no site grading, there was no meaningful excavation as five of the six buildings have no conventional foundation, the buildings are comprised of all natural materials, the shingles on the cabin roofs are natural cedar and not asphalt, the camp is to contain no concrete and all pathways in the camp are made entirely of mulch.

Mr. Launay also testified to the impervious nature of surfaces in the campsite. He found only the roofs to be classified

---

**12.** Petitioner's other expert witness, Lawrence Whitlock, testified that he also saw no problems with adverse impacts on water quality of the area as a result of the cabins. He too observed no drainage problems as a result of the cabin roofs, as the island's "soil type easily accommodates that run-off." In fact, he stated that, in his opinion, that boat traffic back and forth to the many duck blinds in the marsh presents a greater danger to the area's water quality than do petitioner's cabins.

as impervious, as defined by § 125–7 of the County Code. He found, however, that the roofs did not have the normal consequences of a typical impervious surface, *i.e.,* problems associated with rain run-off. He stated, "the underneath of the building is open . . . to accept run-off that might percolate or pass through from higher portions of the site . . . there's no grading, and there's been no change in the topography." During his inspection of the site, as the cabins were already partially constructed, Mr. Launay observed the actual impact of the camp's cabins on the environment of Phillips Island. He observed no formation of gullies, no erosion and no other evidence that run-off from the cabins was reaching the water protected by the Buffer. The rain, according to Mr. Launay and his soil tests, was absorbed into the ground, thus preventing the run-off of rain into the streams and waterways adjacent to the camp.

Mr. Launay did testify that the camp had some impact on the surrounding habitat. He said that while any human presence would somewhat impact an area like Phillips Island, he observed that petitioner's removal of greenbriar and other understory species of plant somewhat altered the habitat of the island. According to Mr. Launay, however, the removal of such species actually "improve[s] tree quality." He observed that the camp was in a "very natural state" and that "little appreciable change to the wildlife species" had occurred as a result of the building of the cabins. He summarized by saying, "I really can't say that . . . what Mr. Lewis has constructed out there has any real significant impacts on either water quality, the wildlife value of the site or the plant habitat."

Mr. Launay, in fact, testified that the habitat of Phillip Island would fare better with the buildings located in their current position, rather than moving them to the inner portion of the island, *i.e.,* within the narrow, noncontiguous strips of land outside the Buffer. He stated that the habitat there differed very little from the Buffer and that the difference in a few feet had little difference in the impact on the wildlife. He did state that, in the context of Phillips Island, the actual

effects of moving the buildings out of the Buffer would be more devastating to the environment than leaving the cabins in their current location as the move would require petitioner to cut down several large, mature trees that impact large areas both inside and outside the Buffer. Removal of these trees, according to Mr. Launay, would open up large portions of an otherwise undisturbed canopy, thus changing the landscape of the forest, *i.e.,* the oaks, pines and holly occupying the non-Buffer area. Finally, Mr. Launay testified that mitigation of certain native shrubs, coupled with precluding development on the other two upland islands, would have the greatest beneficial effect on the habitat of the property.

The Commission presented two expert witnesses to the Board. LeeAnn Chandler, a natural resources planner for the Commission, included testimony from a letter she submitted to the Board comprising her review of the statutory factors to be considered by the Board in variance cases. She also testified as to the purpose and importance of the Buffer in the scheme of the County Code. Her testimony purported to refute the testimony of petitioner's experts' testimony that the run-off from the cabin roofs did not adversely impact the habitat. She testified to her observations of petitioner's removal of the understory and of its later recovery when new vegetation had grown in those cleared areas. On cross-examination, the following question was asked by petitioner's counsel, "do you have any empirical evidence to support the statement that there's any increase in the volume or velocity of run-off on the roofs on these particular structures on this site?" Ms. Chandler answered, "I can't quantify a specific number, no." The testimony further elicited that Ms. Chandler had no factual basis, in the form of tests, samples or data, to support her conclusions:

"Q.[13] And we don't have any concrete or asphalt driveways or sidewalks on the site, do we?

A. No, we have a lot of treated lumber.

---

13. The "Q" refers to the question asked by petitioner's counsel and the "A" refers to Ms. Chandler's answer.

Q. Treated lumber? Where is that?

A. All the cedar shakes, I'm sure they're treated with something.

Q. Do you know whether they're treated?

A. No, but—

Q. Okay. Did you hear Mr. Launay testify that they were natural cedar siding and natural cedar shakes roofing?

A. Well, they seem to be very regular for being natural. They were in the same shape, size, everything, so they're not completely natural.

Q. You mean because they're cut the same size or shape?

A. And I'm sure they're treated with something.

Q. Like what?

A. Chemicals that help protect it from, from degrading in the environment over time.

Q. But that, that is your speculation?

A. Yes."

Further questioning elicited that Ms. Chandler was relying on potential cumulative impacts of development generally and not site specific data regarding the Phillips Island site.

"Q. And you referred to cumulative impacts?

A. Yes.

Q. Have you determined and are you able to quantify any adverse impact of these particular six buildings on any aspect of water quality in either ground water or the adjacent stream waters of the tributaries of the Nanticoke River?

A. The whole idea of cumulative impact is not to look at each specific little thing. It's the idea that over time—

Q. No, that wasn't my question.

A. —it causes an effect.

Q. My first question, though, is have you determined whether and have you done any testing or have any quantifiable way to show that these buildings have caused any

increased levels of pollutants, nutrients or toxins to the base system?

A. *I have not conducted any studies.*

Q. Nor do you have any such data?

A. I know that there's 33—3370 square feet of less area of infiltration and for habitat.

Q. That's correct. The question, though, is do you have anything from which you can show or demonstrate that that 3300 square feet has caused an increase in the levels of pollutants, nutrients and toxins to the base system?

A. No.

Q. Okay. All right. Now, then, let's look at what the statute says. . . . It doesn't talk about just cumulative impacts, does it? Doesn't the word cumulative impacts refer to human activities that have caused increased levels of pollutants, nutrients and toxins?

A. It states the cumulative impacts of human activity, yes, you're right.

Q. Okay. So only those . . . activities that have caused increased levels of pollutants, etc., are the concern that brings them within this umbrella of cumulative effects?

A. No, it's the cumulative effect that causes the pollutants to have effects. It's . . . the assemblage of all—I mean, if there were ten million of these cabins, that would be cumulative effects, but we don't have to look at this one little, this one island when you're talking about cumulative effects." [Emphasis added.]

The Commission's other expert, Russ Hill, a Department of Natural Resources habitat manager, testified that petitioner had cut vegetation in an area greater than needed to build the cabins of the camp.[14] Mr. Hill, however, went on to state that the vegetation was recovering and the new vegetation will

---

14. Petitioner has not requested a variance for the clearing of this vegetation; he requests a variance only for the building of the cabins inside the Buffer. He admits that this clearing may subject him to penalties and/or fines.

again be a source of food and cover for wildlife, after it fully grows back. He went on to agree with petitioner's expert's advice regarding mitigation and that the species recommended by Mr. Launay would enhance the area's wildlife value. He did state, however, that the buildings altered the current state of the island as vegetation under and immediately surrounding the buildings would not likely remain the same because of the increased human traffic. This, he stated, could adversely affect the native animal species in those areas of human activity. Mr. Hill admitted, however, that this would be true of any building placed in or outside of the Buffer.

Other testimony was brought out by members of the public. The only part of this lay testimony to bring out empirical data was the testimony of Don Jackson, an employee of the Chesapeake Bay Foundation. While the county planners themselves found that only "several trees had been cut" by petitioner, Mr. Jackson testified that he counted 114 tree stumps of five inches or greater in diameter, of which 27 were dead trees. According to Mr. Jackson, twenty one of those stumps were under or near petitioner's buildings although exhibits entered into the record depict photographs of the island and its full tree canopy. Mr. Jackson also testified that the property was used for hunting, fishing and once as a residence, prior to its purchase by petitioner.

At the conclusion of the testimony, several members of the Board indicated the evidence they used in determining their decisions. In referring to a letter Ms. Chandler submitted to the Board, Board Member Ennis stated, in part:

"And the rest of my comments I'm going to make is in the context of that we, or I will be trying to view this and am viewing this as if the buildings were not already there. However, I want to say that I think as far as my opinion goes, ignorance of the law is not an excuse. Somebody should have known better, and I think somebody did know better.

"I believe that within the Chesapeake Bay critical areas report, the cumulative impact, to me—I could be interpret-

ing it wrong—means general impact and not site specific. I think we're talking about cumulative meanings wherever, and it's just a, it's just what it says.

"I think that Don Jackson made a good point that the specific impact, negative impact, let's just say, should be disproved by the Applicant. It's not proved by the opponents, because I do also believe that the burden of proof rests on the Applicants.

"I think that we do risk a dangerous setting of a dangerous precedent with this case if we were to approve it. I don't think that this is a case of unwarranted hardship, and I think it's self-imposed. This is not a home we're talking about building. This is a place to go duck hunting, and in that regard, I don't think that this is a denial of a reasonable and significant use of property because that's what they want to do. They want to have recreation . . . and if there is to be accommodations for sleeping . . . there's space to do that . . . outside the buffer.

. . .

"I generally agree with the letter that was submitted by the Chesapeake Bay Critical Area Commission."

Mr. Ennis stated that if the Board denied petitioner's variance request, he would also be inclined not to allow petitioner to build in the narrow strips outside the Buffer because of the evidence offered by petitioner. Board Member Wolfe, after touting the letter submitted by the Commission, used it to aid him in stating the Board's reasoning in orally denying petitioner's variance request at the October hearing. He relied, in part, that there was no unwarranted hardship as the buildings' construction without a permit was a "self-created hardship" and granting the variance request would have given petitioner a "special privilege." In reference to possible adverse impacts on water quality from rainwater run-off on the roofs, he stated:

"There's been testimony one way and the other regarding whether or not it would have impacted the water quality.

Can't help but have water impact with six structures, six roofs, water shedding off those. Whether or not they perk directly into the ground or not, it would eventually find itself, it would find its way into the ground water, and cedar shingles do have a natural cedar oil which may or may not be toxic and cause problems."

Board Member Baker suggested one amendment to the unanimous oral decision denying petitioner's variance request when he said, "In the past, the Board has on occasion, especially when both sides are represented by attorneys, requested that draft findings be prepared by the party in whose favor the motion goes, so if the Critical Area Commission would be willing to draft the findings?" Respondent's counsel answered, "Sure." Four months later, on February 13, 2001, the Board adopted the findings of fact that the Commission drafted without substantive change or adopting any of petitioner's comments in its written decision.

## II. Standard of Review

■■ We have very recently set out the standard of review for this Court's review of zoning board decisions in *Stansbury v. Jones*, 372 Md. 172, 182–85, 812 A.2d 312, 318–20 (2002), where we said:

"Almost a half-century ago, in a case involving a denial of a use permit, we stated: 'It is a clearly established rule in the law of zoning that a court may not substitute its judgment for that of the Zoning Board.' *Dorsey Enterprises, Inc. v. Shpak*, 219 Md. 16, 23, 147 A.2d 853, 857 (1959). Chief Judge Hammond wrote for the Court in *State Ins. Comm'r v. National Bureau of Casualty Underwriters*, 248 Md. 292, 309, 236 A.2d 282, 292 (1967), that 'under ... [either] of the standards the judicial review essentially should be limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. (alteration added).'

"Whether reasoning minds could reasonably reach a conclusion from facts in the record is the essential test. If such a conclusion is sufficiently supported by the evidence, then

it is based upon substantial evidence. Forty years ago in *Snowden v. Mayor and City Council of Baltimore,* 224 Md. 443, 447–48, 168 A.2d 390, 392 (1961), we noted that:

> 'The substantial evidence test "means that the reviewing court's inquiry is whether on the record the agency could reasonably make the finding." ... Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." The heart of the fact finding process often is the drawing of inferences from the facts. The administrative agency is the one to whom is committed the drawing of whatever inferences reasonably are to be drawn from the factual evidence. "The Court may not substitute its judgment on the question whether the inference drawn is the right one or whether a different inference would be better supported. The test is reasonableness, not rightness." ' [Citation omitted.]

Over twenty years later we opined, 'if the evidence makes the issue of harm fairly debatable, the matter is one for the Board's decision, and should not be second-guessed by an appellate court.' *Board of County Commissioners for Cecil County v. Holbrook,* 314 Md. 210, 218, 550 A.2d 664, 668 (1988). *See also Ramsay, Scarlett & Co., Inc. v. Comptroller of the Treasury,* 302 Md. 825, 490 A.2d 1296 (1985) and *Comptroller of the Treasury v. World Book Childcraft International, Inc.,* 67 Md.App. 424, 508 A.2d 148 (1986).

"In *White v. North,* 356 Md. 31, 44, 736 A.2d 1072, 1079 (1999), we much more recently restated the general standard of review that:

> 'In judicial review of zoning matters, including special exceptions and variances, "the correct test to be applied is whether the issue before the administrative body is 'fairly debatable,' that is, whether its determination is based upon evidence from which reasonable persons could come to different conclusions." *Sembly v. County Bd. of Appeals,* 269 Md. 177, 182, 304 A.2d 814, 818 (1973). *See also Board of County Comm'rs v. Holbrook,* 314 Md. 210, 216–17, 550 A.2d 664, 668 (1988); *Prince George's County*

*v. Meininger,* 264 Md. 148, 151, 285 A.2d 649, 651 (1972); *Zengerle v. Board of County Comm'rs,* 262 Md. 1, 17, 276 A.2d 646, 654 (1971); *Gerachis v. Montgomery County Bd. of Appeals,* 261 Md. 153, 156, 274 A.2d 379, 381 (1971). For its conclusion to be fairly debatable, the administrative agency overseeing the variance decision must have "substantial evidence" on the record supporting its decision. *See Mayor of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 395, 396 A.2d 1080, 1087 (1979); *Montgomery County v. Woodward & Lothrop, Inc.,* 280 Md. 686, 706, 376 A.2d 483, 495 (1977), *cert. denied sub nom. Funger v. Montgomery County,* 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 769 (1978); *Agneslane, Inc. v. Lucas,* 247 Md. 612, 619, 233 A.2d 757, 761 (1967).'

*See also People's Counsel for Baltimore County v. Mangione,* 85 Md.App. 738, 743–44, 584 A.2d 1318, 1320–21 (1991); *Terranova v. Board of Trustees of the Fire and Police Employees Retirement Sys.,* 81 Md.App. 1, 8–9, 566 A.2d 497, 500–01 (1989) *cert. denied,* 319 Md. 484, 573 A.2d 808 (1990); *Tennison v. Shomette,* 38 Md.App. 1, 5, 379 A.2d 187, 190 (1977), *cert. denied,* 282 Md. 739 (1978); *Fitzgerald v. Montgomery County,* 37 Md.App. 148, 153, 376 A.2d 1125, 1128, *cert. denied,* 281 Md. 737 (1977), *cert. denied sub nom. Mutyambizi v. Maryland,* 439 U.S. 854, 99 S.Ct. 164, 58 L.Ed.2d 160 (1978); *Anne Arundel County v. Maryland Nat'l Bank,* 32 Md.App. 437, 440, 361 A.2d 134, 136 (1976).

"Nonetheless, we have also indicated in our cases *that where an administrative agency's conclusions are not supported by competent and substantial evidence, or where the agency draws impermissible or unreasonable inferences and conclusions from undisputed evidence, such decisions are due no deference.* In *Belvoir Farms Homeowners Association, Inc. v. North,* 355 Md. 259, 267–68, 734 A.2d 227, 232 (1999), we stated:

'Generally, *a decision of an administrative agency, including a local zoning board, is owed no deference when its conclusions are based upon an error of law. Catonsville Nursing Home, Inc. v. Loveman,* 349 Md.

·560, 569, 709 A.2d 749, 753 (1998) ("[W]e may reverse an administrative decision premised on erroneous legal conclusions." (citing *People's Counsel v. Maryland Marine Mfg. Co.*, 316 Md. 491, 497, 560 A.2d 32, 34–35 (1989))).'

"In *Maryland Marine Mfg., supra,* 316 Md. at 496–97, 560 A.2d at 34–35, we said:

'As we have frequently indicated, the order of an administrative agency must be upheld on judicial review if it is not based on an error of law, *and if the agency's conclusions reasonably may be based upon the facts proven.* But a reviewing court is under no constraints in reversing an administrative decision which is premised solely upon an erroneous conclusion of law.' [Citation omitted.] [Emphasis added.]

We noted in *Washington National Arena Limited Partnership v. Comptroller of the Treasury,* 308 Md. 370, 378, 519 A.2d 1277, 1281 (1987) (quoting *Ramsay, Scarlett & Co.,* 302 Md. at 834, 490 A.2d at 1301), that: ' "a reviewing court is under no statutory constraints in reversing a Tax Court order which is premised solely upon an erroneous conclusion of law." '

"We said in *Elliott v. Joyce,* 233 Md. 76, 81–82, 195 A.2d 254, 256 (1963) that:

'We hold that "on the record" before us, the Board could not "reasonably make" the reclassification and grant the special exception. Therefore, its action in so doing was arbitrary and capricious in a legal sense. To permit a gasoline station in the residential surroundings of the subject property would not promote the safety, health or general welfare of the community, but would constitute, we think, invalid "spot zoning." *Baylis v. City of Baltimore,* 219 Md. 164, 148 A.2d 429 [1959]; *Hewitt v. County Comm'rs,* 220 Md. 48, 151 A.2d 144 [1959].' [Alterations added.]

"The standard in respect to judicial review is, generally, the same whether the agency grants or denies relief." [Some emphasis added.]

We also note that " 'Such [zoning] ordinances are in deroga-tion of the common law right to so use private property as to realize it highest utility.' " *White*, 356 Md. at 48, 736 A.2d at 1082 (quoting *Aspen Hill Venture v. Montgomery County Council*, 265 Md. 303, 313–14, 289 A.2d 303, 308 (1972) (quot-ing *Landay v. Board of Zoning Appeals*, 173 Md. 460, 466, 196 A. 293 (1938)).

We hold that while the Board purported to use the stan-dards set forth in *Belvoir Farms, White*, and *Mastandrea*, in determining the fate of petitioner's variance, the statements by Board members and the Board's final written decision illustrate that several impermissible legal standards were utilized. In addition, the record contains little or no empirical data to support the Board's conclusions or to refute the studies and reports of petitioner's experts. The Board's deci-sion is thus arbitrary and capricious. We therefore vacate the Court of Appeals' and the Circuit Court's affirming of the Board's decision and direct the Circuit Court to remand this case to the Board for a reassessment of petitioner's variance request in light of our holding.

### III. Discussion

### A. The Wicomico County Code

The sections of Article VI of the Wicomico County Code authorizing the Board to grant variances and noting the criteria to be considered in determining whether to grant or deny variance requests in the Buffer state:

" § 125–35. **Authorization.**

The Wicomico County Board of Zoning Appeals is hereby empowered to grant variances to the provisions of this chapter where, owing to special features of a site or other circumstances, a literal enforcement of provisions would result in *unwarranted hardship.*

" § 125–36. **Bases for grants.**

The Board of Zoning Appeals shall examine all facts of the case and render a decision. Variance requests in the Critical Area District shall not be granted unless the deci-sion is based on the following criteria:

A. That *special conditions or circumstances exist that are unique to the subject property* or structure and that a strict enforcement of the provisions of this chapter would *result in unwarranted hardship* which is not generally shared by owners of property in the same land use management areas ... of the Critical Area District.

B. That strict enforcement of the provisions within the Critical Area District would deprive the property owner of rights commonly shared by other owners of property in the same management area within the Critical Area District.

C. That the granting of a variance will not confer upon an applicant any special privilege that would be denied to other owners of like property and/or structures within the Critical Area District.

D. That the variance request is not based upon conditions or circumstances which are self-created or self-imposed, nor does the request arise from conditions or circumstances either permitted or nonconforming which are related to adjacent parcels.

E. That the granting of the variance will not adversely affect water quality or adversely impact fish, wildlife or plant habitat within the Critical Area District, and that the granting of the variance will be consistent with the spirit and intent of the critical area program and associated chapters.

F. That greater profitability or lack of knowledge of the restrictions shall not be considered as sufficient cause for a variance.

G. That the proposed variance is consistent with the Wicomico County Comprehensive Plan and Chapter 225, Zoning."

County Code, §§ 125–35 and 125–36 (emphasis added). The County Code continues by placing certain conditions on the granting of a variance in § 125–38:

" **§ 125–38. Conditions. ...**

A variance will not be granted by the Board of Zoning Appeals unless and until:

A. A completed application form for a variance is submitted which demonstrates the applicability of the above criteria. In addition, requests for variance in the Critical Area District shall not be heard unless the State's Critical Area Commission has received a copy of the variance application at least two weeks prior to the scheduled public hearing.

B. The Board of Zoning Appeals shall find that the reasons set forth in the application justify the granting of the variance and that the variance is the minimum variance that will make possible the reasonable use of land, building or structures. In making this determination for variance requests in the Critical Area District, the Board of Zoning Appeals shall consider the following guidelines:

(1) That the granting of a variance results in new structures or impervious surfaces being located as far back from mean high water, tidal wetlands or tributary streams in the critical area as is feasible.

(2) That the applicant takes steps to mitigate impacts, insofar as possible, including:

(a) Reforestation on the site to offset disturbed forested or developed woodlands on at least an equal-area basis.

(b) Afforestation of areas of the site so that at least 15% of the gross site is forested.

(c) Implementation of any mitigation measures which relate to habitat protection areas, as delineated in the Wicomico County Critical Area Program, recommended by state and/or County agencies are included as conditions of approval.

(3) The Board of Zoning Appeals shall further find that the granting of the variance will be in harmony with the general purpose and intent of this chapter, shall not result in a use not permitted in the zone in which the property subject to variance is located and will not be injurious to the neighborhood or otherwise detrimental to the public welfare.

(4) For variances in the Critical Area District, the Board of Zoning Appeals shall find that the granting of the

variance will be in harmony with the general purpose and intent of this chapter and the Wicomico County Critical Area Program, shall not result in a use not permitted in the management area . . . or an increase in the number of permitted dwelling units (i.e., density limits) in which the property subject to the variance is located and will not be injurious to the neighborhood or otherwise detrimental to the public welfare.

(5) In addition, and to the extent possible based on best available information, all property owners immediately contiguous to the application shall be notified by certified mail and furnished a copy of said application.

(6) In granting the variance, the Board of Zoning Appeals may prescribe such conditions and safeguards as it deems appropriate which comply with the intent of this chapter and the Wicomico County Critical Area Program. Violations of such conditions and safeguards, when made part of the terms under which the variance is granted, shall be deemed a violation of this chapter and punishable under Article IX."

Section 125–35 of the County Code empowers the Board to grant variances to the provisions of Chapter 125 where an applicant, because of "special features of a site or other circumstances, a literal enforcement of provisions would result in unwarranted hardship." As a result, the ultimate inquiry is whether applicants, like petitioner, suffer an unwarranted hardship because of special features of their property. This Court has recently interpreted the "unwarranted hardship" standard, as used by the County Code, as the equivalent of the general "unnecessary hardship" standard used in zoning variance law. *See White,* 356 Md. at 46 n. 12, 736 A.2d at 1081 n. 12; *Belvoir Farms Homeowners Association, Inc. v. North,* 355 Md. 259, 275–76, 734 A.2d 227, 236–37 (1999).

In *Belvoir Farms,* we ultimately held that the "unwarranted hardship" standard was akin to the denial of a reasonable and significant use of the property, when we said:

"We reject the proposition that the unnecessary or unwarranted hardship standard is equal to an unconstitutional

taking standard. If this were true, it would be a superfluous standard because the constitutional standard exists independent of variance standards. We generally avoid a construction of statutory language that would render the statute unnecessary, meaningless, or redundant. *See Hyle v. Motor Vehicle Admin.*, 348 Md. 143, 149, 702 A.2d 760, 763 (1997); *Board of County Comm'rs v. Bell Atlantic– Maryland*, 346 Md. 160, 178, 695 A.2d 171, 180 (1997).

"We hold, therefore, that the unnecessary or unwarranted hardship standard, or similar standards, are less restrictive than the unconstitutional taking standard. The *unwarranted hardship standard, and its similar manifestations, are equivalent to the denial of reasonable and significant use of the property.* Whether a property owner has been denied reasonable and significant use of his property is a question of fact best addressed by the expertise of the Board of Appeals, not the courts. Thus, we leave the application of this standard to petitioner's variance application to the Board on remand."

*Belvoir Farms*, 355 Md. at 282, 734 A.2d at 240 (emphasis added).

In determining whether such an unwarranted hardship exists, *i.e.*, whether the applicant's intended use is a reasonable and significant use, the Wicomico County Zoning Board must apply the criteria enumerated in § 125–36 of the County Code to the variance request before it. We have recently held, in *White*, that these criteria must be applied in total and generally, and that no individual factor is to be determinative. We further explained the application of the "unwarranted hardship" standard, when we said:

"[T]he essential determination is whether an unwarranted hardship exists.[15] The specific factors that must be considered cannot be construed individually to overrule a finding

---

**15.** In fact, the construction of the Wicomico County Code supports this application of the unwarranted hardship standard, as the County Code sets out the unwarranted hardship determination in a separate provi-

of unwarranted hardship any more than they could overrule a finding of an unconstitutional taking of one's property. The individual provisions that must be considered are part of the entire matrix that defines what information is necessary to reach a finding as to the existence or nonexistence of an unwarranted hardship."

*White,* 356 Md. at 50–51, 736 A.2d at 1083 (alteration added).

We further explained the application of the "unwarranted hardship" standard in *Mastandrea,* 361 Md. 107, 760 A.2d 677

---

sion, § 125–35, than the provision listing the factors to be considered. Section 125–35 states:

"The Wicomico County Board of Zoning Appeals is hereby empowered to grant variances to the provisions of this chapter where, owing to special features of a site or other circumstances, a literal enforcement of provisions would result in *unwarranted hardship.*" [Emphasis added.]

The following section, § 125–36, lists those essential factors to be considered by the Board in making the unwarranted hardship determination. Section 125–36(A) also includes the words "unwarranted hardship," but the inclusion of the phrase does not eliminate the need for the Board to consider all of the factors that follow. Section 125–36 of the County Code, in relevant part, states:

"The Board of Zoning Appeals shall examine all facts of the case and render a decision. Variance requests in the Critical Area District shall not be granted unless the decision is based on the following criteria:

A. That *special conditions or. circumstances exist that are unique to the subject property* or structure and that a strict enforcement of the provisions of this chapter would *result in unwarranted hardship* which is not generally shared by owners of property in the same land use management areas ... of the Critical Area District...." [Emphasis added.]

Because of the existence of § 125–35, subsection (A) does not support the proposition which respondent posits, that "Once the Board found that Mr. Lewis failed to prove an unwarranted hardship, the Board could have stopped its analysis." Subsection (A)'s purpose is merely to factor the uniqueness of the property into the criteria used in the ultimate determination of § 125–35, whether unwarranted hardship exists.

In addition, respondent argues that "the Board was not required to make negative findings on each one of the variance standards." We agree, however, the Board still needs to *address* each criterion of § 125–36 and balance both negative and positive criteria together and use them as "part of the entire matrix that defines what information is necessary to reach a finding as to the existence or nonexistence of an unwarranted hardship." *White,* 356 Md. at 51, 736 A.2d at 1083.

(2000). In *Mastandrea,* the Mastandreas applied for a variance for pathways they had built within the Critical Area Buffer located on their property for the purpose of allowing their disabled, wheelchair-bound daughter to access the waterfront of the property. We held that strict adherence to the code would constitute an unwarranted hardship for the Mastandreas, as their property's subjection to other reasonable uses did not preclude the requested variance because the proposed variance's use was also a reasonable use in light of the special conditions of the land and circumstances of the daughter's disability. We stated:

"The Commission also argued that, 'at most,' the denial of the variance would cause the Mastandreas an 'inconvenience,' not an unwarranted hardship, because relocating the lateral pathways outside of the buffer area would not prevent a reasonable and significant use of the 'entire' property.

"In *White v. North,* we were asked whether the Anne Arundel County Board of Appeals properly granted the Whites a variance to construct a swimming pool in their backyard which, because of its slope, was within the extended Critical Area buffer provided for by the Chesapeake Bay Critical Area regulations. After an extensive review of the Chesapeake Critical Area Program, we focused on Anne Arundel County Code Article 3, § 2–107, which governs the issuance of a Critical Area variance and which lists a series of factors, similar to the ones in the present case, which an applicant must persuade the Board are satisfied. We *initially explained that the first factor, whether 'strict implementation of the County's Critical Area program would result in an unwarranted hardship,' was the determining consideration. We concluded that the other factors provided guidance for the unwarranted hardship analysis, and resolved that the question was not whether the Whites' variance request met every factor in Anne Arundel County Code § 2–107, but whether the information derived from all of those factors amounted to an unwarranted hardship.* Moreover, we added that forcing compliance with every

individual factor might have unconstitutional taking implications.

"When discussing the unwarranted hardship standard in *White,* we relied on our previous analysis of a similar issue in *Belvoir Farms v. North,* 355 Md. 259, 734 A.2d 227 (1999). There, we defined 'unwarranted hardship' as 'a denial of reasonable and significant use' of the land. In explaining this standard, we made clear that unwarranted hardship is a lesser standard than that required to prove an unconstitutional taking. Moreover, we determined that '[w]hether a property owner has been denied reasonable and significant use of his property is a question of fact best addressed by the expertise of the Board of Appeals, not the courts.'

*"The Board in this case, therefore, did not have to consider whether denying the variance would have denied the Mastandreas a reasonable and significant use of the 'entire' lot. Rather, the Board was required to (and did) consider whether the property owners, in light of their daughter's disability, would be denied a reasonable and significant use of the waterfront of their property without the access that the path provided.* There is substantial evidence in the record establishing that, without the path, a person in a wheelchair could not enjoy the waterfront portion of the property.

"Evidence before the Board indicated that the soil composition of the Mastandreas' property near the shoreline, 'one of the heaviest clay soils' their expert 'had ever tested,' does not allow handicap access to the waterfront. The record indicates that the Commission neither offered any evidence to the contrary nor questioned the Mastandreas' expert witness on this point when he testified before the Board. The Commission did not offer such evidence apparently because it did not conduct any site-specific studies or project a quantifiable adverse impact of the path on the Critical Area buffer or Glebe Creek. In other words, there is no evidentiary refutation by the Commission on the record that would support its argument that the Mastandreas' property

is not unique or 'in any way different from other properties in the neighborhood or in the Talbot County Critical Area.'

"The record evidence supports the Mastandreas' assertion, and substantiates the Board's finding, that there was a special condition or circumstance unique to the lot. The record also supports the Board's finding that, without the pathway in question, Leah would not be able to access reasonably the rear yard, view wildlife along the water's edge, or participate in shoreline-oriented activities."

*Mastandrea,* 361 Md. at 134–37, 760 A.2d at 691–93 (citations omitted)(footnotes omitted)(emphasis added).

■ In consideration of these standards, the Board in the case *sub judice* must use the criteria within § 125–36 of the County Code to determine the ultimate question of whether strict enforcement of § 125 would deny petitioner a reasonable and significant use of his land. In doing so, it is clear that the Board should apply a standard that does not look to whether petitioner would be denied all reasonable uses of his entire property, but rather a standard that should determine if petitioner's proposed use is a reasonable and significant one in consideration of all of the § 125–36 factors. As we shall discuss, although the Board purported to act otherwise, it essentially applied the incorrect "unconstitutional takings" standard.

## B. Errors of Law

In the case *sub judice,* petitioner argues that while the Board claimed to use the holdings of this Court's cases in its decision regarding petitioner's variance, the Board, in reality, failed to apply correctly those standards. In addition, petitioner asserts that the Board committed other errors of law. The first of these other assertions, in addition to the alleged misapplication of this Court's holdings, is that the Board failed to apply correctly the appropriate criteria under the § 125–36. Petitioner further argues that the Board misconstrued the criteria that it did apply. We shall first address petitioner's

contention that the Board misconstrued our recent decisions in *Belvoir Farms, White* and *Mastandrea*.[16]

The primary basis of the Board's error, as argued by petitioner, is that the Board applied the incorrect standard of unwarranted hardship in this case. Petitioner contends that, regardless of the Board's statement noting that "the Board has applied the law as announced in those cases to the facts and evidence presented to the Board,"[17] the Board, at the encouragement of the Commission, misconstrued the "unwarranted hardship" standard. Instead, petitioner contends, the Board actually applied what was essentially akin to the unconstitutional takings standard,[18] a standard which has been specifically rejected in variance request determinations by this Court. *See Belvoir Farms, supra.* Respondent contends that the Board's decision sufficiently illustrates that the correct standard was applied, because it defined the proper standard and stated that the Board indeed "applied the law as announced in those cases."

In its written decision the Board, in its fifth "Specific Findings of Fact," stated:

"After considering the evidence in accordance with the controlling legal authority, the Board finds that the Applicant will not suffer an unwarranted hardship without the

---

**16.** This case is not governed by the recent change in the statute, because this case was resolved prior to the effective date of the new statute. *See* 2002 Md. Laws, § 2, Chapters 431, 432 ("this Act shall be construed to apply only prospectively and may not be applied or interpreted to have any effect on or application to any variance application for which a petition for judicial review of a decision to grant or deny a variance under a local critical area program was filed before June 1, 2002.")

**17.** The cases referred to by the Board were *Belvoir Farms, White* and *Mastandrea*.

**18.** "An unconstitutional taking of property generally is proved when a 'regulation denies all economically beneficial or productive use of the land.'" *Belvoir Farms*, 355 Md. at 281–82, 734 A.2d at 240, (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992)).

variance for the six buildings *because he will continue to enjoy reasonable and significant use of the Island and the property without the requested variance.* At the hearing, testimony of the Applicant's witness and the Critical Area Commission witness, established that the Island contains over 10,000 square feet of land that does not lie within the Tidal Buffer. A reasonably-sized structure could be sited in this non-Buffer area for the occasional use of persons who hunt on the property. Further testimony established that the property contained at least 12 waterfowl blinds when Mr. Lewis purchased the land, and that the property had been used for hunting purposes by previous owners for many years. *Accordingly,* the Board finds that denial of a variance for six new buildings will not deny to Mr. Lewis the reasonable and significant use of the Island or of the property and that he will not suffer an unwarranted hardship." [Emphasis added.]

The Board misconstrues the cases. In respect to variances in buffer areas, the correct standard is not whether the property owner retains a reasonable and significant use for the property outside the buffer, but whether he or she is being denied a reasonable use of property within the buffer. The facts used by the Board in finding that no unwarranted hardship existed were discussed in the context of whether petitioner could still have a viable, reasonable and productive use of his entire property without the variance. The Board's reliance on facts suggesting alternative uses and possible construction outside of the Buffer is akin to asking whether denying petitioner's variance request will result in denying him "all economically beneficial or productive use of the land," *i.e.,* the unconstitutional takings standard. Use of this standard is in *direct* opposition to our holding in *Belvoir Farms.* The Board's decision clearly illustrates that it rested on this improper standard—whether the Board, in the language formulated by the Commission, says so or not.

In addition, the Board also focused on petitioner's ability to use the pre-existing 12–15 waterfowl blinds located in the marsh, *i.e.,* the Board considered petitioner's use of his

entire property, some of which is across the river, not merely the island where the variance was sought. What reasonable and significant use petitioner can make of the portions of his land other than the specific area subject to his variance request is irrelevant to the unwarranted hardship determination. As we held in *Mastandrea:*

> "The Board ... did not have to consider whether denying the variance would have denied the Mastandreas a reasonable and significant use of the 'entire' lot. Rather, the Board was required to ... consider whether the property owners, in light of their daughter's disability, would be denied a reasonable and significant use of the waterfront of their property without the access that the path provided."

*Mastandrea,* 361 Md. at 136, 760 A.2d at 693. Thus, the Board should have considered petitioner's variance request in the context of whether petitioner was denied a reasonable and significant use of Phillips Island, the area he requested to be used by the hunting camp. In relying on petitioner's ability to use his property outside of Phillips Island, *i.e.,* by considering petitioner's ability to use pre-existing hunting-related structures on other, remote, across the river portions of his property, the Board's analysis is in derogation of our holdings in *White* and *Mastandrea* and thus constitutes legal error.

The Board also appears to have misapplied *White* otherwise. In *White,* in the context of whether the Anne Arundel County Board of Zoning Appeals[19] properly granted a variance to build a swimming pool in White's backyard that

---

19. The relevant provisions of the Anne Arundel County Code in *White* were strikingly similar to the ones in the case at bar, with the exception that the Wicomico County Code includes the word "unique," in the provision discussing unwarranted hardships. As quoted in *White,* the Anne Arundel County Code Article 3, § 2–107 stated in relevant part:

> "(b) For a property located in the Critical Area, a variance to the requirements of the County critical area program may be granted after determining that:
> (1) due to the features of the site or other circumstances other than financial considerations, strict implementation of the County's critical area program would result in an unwarranted hardship to the applicant;

was located within the Critical Area Buffer, we explained that the first factor, the unwarranted hardship factor, was the determinative consideration, while the other factors merely provided the Board with guidance in its application of the unwarranted hardship standard. We stated:

> "The specific factors that must be considered cannot be construed individually to overrule a finding of unwarranted hardship any more than they could overrule a finding of an unconstitutional taking of one's property. The individual provisions that must be considered are part of the entire matrix that defines what information is necessary to reach a finding as to the existence or nonexistence of an unwarranted hardship."

(2) a literal interpretation of the Code of Maryland Regulations, Title 27, Subtitle 01, Criteria for Local Critical Area Program Development, or the County critical area program and related ordinances will deprive the applicant of rights commonly enjoyed by other properties in similar areas within the critical area of the County;

(3) the granting of a variance will not confer on an applicant any special privilege that would be denied by COMAR, Title 27, Subtitle 01 or the County critical area program to other lands or structures within the County critical area;

(4) the variance request:

(i) is not based on conditions or circumstances that are the result of actions by the applicant; and

(ii) does not arise from any condition relating to land or building use, either permitted or non-conforming, on any neighboring property; and

(5) the granting of the variance:

(i) will not adversely affect water quality or adversely impact fish, wildlife, or plant habitat within the County's critical area; and

(ii) will be in harmony with the general spirit and intent of the County critical area program.

(c) A variance may not be granted under subsection (a) or (b) of this section unless the Board finds that:

(1) the variance is the minimum variance necessary to afford relief;

(2) the granting of the variance will not:

(i) alter the essential character of the neighborhood or district in which the lot is located;

(ii) substantially impair the appropriate use or development of adjacent property;

(iii) be contrary to acceptable clearing and replanting practices required for development in the critical area; or

(iv) be detrimental to the public welfare."

*White*, 356 Md. at 44–46, 736 A.2d at 1080.

*White*, 356 Md. at 50–51, 736 A.2d at 1083. The Board's analysis in this case, which claimed to have considered each factor individually, found that petitioner would not suffer an unwarranted hardship from the denial of the variance request *before* it even discussed any of the § 125–36 factors. This is in total disregard for our holding in *White* and is illustrative of the Board's use of legal standards contrary to this Court's holdings; this constitutes legal error necessitating reversal.

Another of petitioner's main contentions is that the Board erred when it considered, and later relied on, the Commission's argument that petitioner's variance request was not an "unwarranted hardship," but a self-induced hardship. The Commission's argument that petitioner's variance request fell into the category of a self-induced hardship and the Board's reliance on such a factor was in error. We recently discussed the concept of self-induced hardships in the cases of *Richard Roeser Professional Builder, Inc. v. Anne Arundel County*, 368 Md. 294, 793 A.2d 545 (2002), and *Stansbury v. Jones*, 372 Md. 172, 812 A.2d 312 (2002). In *Roeser*, we held that a landowner was not precluded from seeking or receiving an area variance for development of his property in spite of the fact that he purchased the property with notice that it was subject to environmental regulations, including the fact that the property was within a Critical Area Buffer. We held that the landowner's mere purchase of the property, although possessed of that knowledge, was not a self-created hardship relieving the Board of its duty to consider his variance application based on all of the statutory criteria. We stated:

> "The types of hardships that are normally considered to be self-created in cases of this type do not arise from purchase, but from those actions of the landowner, himself or herself, that create the hardship, rather than the hardship impact, if any, of the zoning ordinance on the property." [20]

---

**20.** But for the impact of the Critical Area "buffer" regulations, the owner's proposed use of the property, whether through the permitted

*Roeser,* 368 Md. at 314, 793 A.2d at 558. We then went on to discuss in detail several Maryland cases that had spoken on the issue of self-created hardship, including, *inter alia, Ad + Soil, Inc. v. County Commissioners of Queen Anne's County,* 307 Md. 307, 513 A.2d 893 (1986), and *Salisbury Board of Zoning Appeals v. Bounds,* 240 Md. 547, 214 A.2d 810 (1965).[21]

Later, in *Stansbury,* we held a landowner's re-subdivision of her property in order to comply with non-critical area requirements did not amount to a self-created hardship. We stated:

"It was clear to anyone examining the Administrative Plat that there was only one express limitation imposed on the subject property by the re-subdivision approval, *i.e.,* that no residences could be built on the parcel until, and if, it passed a percolation test. No other limitations were noted on the plat. Our examination of the record does not reflect that any other limitations were imposed on the parcel during the process.

"Subsequently, it was determined that there was an area within the parcel that could, and did, pass a percolation test. However, the use of that area for the sanitary system to be utilized for a residence on the parcel left an insufficient remaining area to accommodate the type of structure re-

---

use of the existing buildings, or being permitted to erect new buildings, would not violate the provisions of the statutes.

21. Respondent asserts that these cases are instructive to the situation at bar. The cases discussed in *Roeser* and later in *Stansbury,* however, are distinguishable in that *Ad + Soil, Bounds* and the Court of Special Appeals case, *Cromwell v. Ward,* 102 Md.App. 691, 651 A.2d 424 (1995), presented situations where the landowner's only assertion was that the landowner's self-created noncompliance with the regulations itself made the variance necessary; they did not claim that any unique characteristics of the land created the hardship, or that any regulations were responsible for the hardship. In the case *sub judice,* petitioner makes no such argument. He merely asserts that, regardless of whether he had commenced with construction of his hunting camp, the unique characteristics of Phillips Island, as impacted upon by the buffer provisions of the Critical Areas law, result in an unwarranted hardship.

quired to be built by covenants that affect the lots within the development and still be in compliance with 'yard,' and other requirements, both critical areas and otherwise, of the zoning ordinance. At that point, the petitioner sought the various approvals, by way of area variances, which would be needed in order for a residential structure to be constructed on the parcel. Because the land, or a portion of it, was either in the critical area, or the critical area buffer zone, review by the Chesapeake Bay Critical Area Commission also was sought. That Commission interposed no objection to the project. Petitioner then sought critical area and other variances necessary to accommodate her proposed project. *The relief she sought via the variance process was of the same type, if not scope, of the relief she might have had to seek had she never re-subdivided the property in the first instance.*"

*Stansbury,* 372 Md. at 208–09, 812 A.2d at 333–34 (footnotes omitted)(emphasis added). It is clear from these cases that a landowner purchasing a piece of property is subject to the regulations in effect prior to any improvement or change the landowner affirmatively effectuates on the land including provisions recognizing a land owner's right to seek a variance from those regulations. The situation here presents us with a similar issue. If petitioner had not commenced the construction of his hunting cabins, he would have still needed to seek a variance, as would have his predecessor, in order to build the camp, just as Ms. Stansbury "might have had to seek [a variance] had she never re-subdivided the property in the first instance." *Id.* at 209, 812 A.2d at 334. (alteration added). The existence of the partially constructed camp, in no way, was determinative on his need for a variance. In other words, the sole fact that the structures are there and were not permitted when built does not negate the argument that were he not permitted to place them there had he not already built them, or keep them there, an unwarranted hardship would exist. In such situations, it is necessary to consider the application as if the structures are not there, and determine whether an un-

warranted hardship would exist if they were not permitted to be placed there.[22] After the procedures, if a variance is properly denied the buildings must be removed. If a variance is properly approved the buildings can remain.

 In essence, the issue of petitioner's construction of his six hunting camp buildings prior to his applying for a variance request is a "red herring." As previously mentioned, under the County Code and, more importantly, because of the physical characteristics of Phillips Island, petitioner needed a variance to build any camp on the island regardless of whether he had started construction before applying for the variance due to the small, irregular, non-contiguous shape of the non-Buffer area on Phillips Island. Petitioner does not claim, as the Commission would have this Court believe, that it is a hardship for him to move the buildings from where they currently sit. Essentially, his claim is that his property has unique physical characteristics which entitle him to receive a variance in order to avoid an unwarranted hardship. The

---

**22.** After the conclusion of the testimony, the comments of Board Member Ennis reflect that while the Board purported, "on paper," to make its decision as if the cabins had not been built, it clearly did not do so. Mr. Ennis said:

"And the rest of my comments I'm going to make *is in the context of that we, or I will be trying to view this and am viewing this as if the buildings were not already there. However, I want to say that I think as far as my opinion goes, ignorance of the law is not an excuse. Somebody should have known better, and I think somebody did know better.*

"I believe that within the Chesapeake Bay critical areas report, the cumulative impact, to me—I could be interpreting it wrong—means general impact and not site specific. I think we're talking about cumulative meanings wherever, and it's just a, it's just what it says.

. . .

"I think that we do risk a dangerous setting of a dangerous precedent with this case if we were to approve it. *I don't think that this is a case of unwarranted hardship, and I think it's self-imposed.* This is not a home we're talking about building. This is a place to go duck hunting, and in that regard, I don't think that this is a denial of a reasonable and significant use of property because that's what they want to do. *They want to have recreation . . . and if there is to be accommodations for sleeping . . . there's space to do that . . . outside the buffer."* [Emphasis added.]

Board should have analyzed petitioner's request in this light and *not* in the context of a self-created hardship.

In fact, the record reflects that petitioner and the county planning staff had originally agreed to apply for a variance whereby some of the six hunting buildings would be moved out of the Buffer. It was only after petitioner had two experts conduct an environmental assessment of Phillips Island, as suggested by the county staff, that he amended his variance request, thereby requesting to leave the cabins "where they sit." The well-documented reasons for this change were *not* due to any hardship that petitioner would incur as a result of the move, but because of the *harm that the move would cause on the environment.* Petitioner's environmental experts advised him, in essence, that only three non-contiguous strips of the island were located outside of the Buffer, that those areas were densely populated with mature trees and flourishing holly patches, that moving and constructing his cabins in the non-Buffer area would require harming that vegetation and that removing the vegetation would destroy the full and thriving canopy of trees, thereby creating significant adverse impacts on the ecosystem of Phillip Island. Only in the context of this recommendation, *i.e.,* that, because of the unique configuration of petitioner's island, constructing his camp outside of the Buffer would be more environmentally damaging than leaving the camp in its current location, did petitioner amend his hardship position. As his hardship was a result of the unique physical features of his property and *not* because of actions taken by petitioner, there could be no self-created hardship. Thus, respondent's attempt to focus on, and the Board's reliance on, this issue was improper and constituted a reversible error of law.

Petitioner additionally takes issue with the Commission's advocating of a "cumulative impacts" (or "cumulative effects") of development argument to the Board. Petitioner asserts that this Court precluded a general "cumulative impact" argument in our *Mastandrea* decision and that the Commission intentionally argued this incorrect standard to the Board. In *Mastandrea,* we said:

"The Commission makes several assertions regarding the Board's application of this factor of the Zoning Ordinance. First, the Commission argues that perhaps the most important of the seven variance factors is that the variance be in 'harmony with the general spirit and intent of the Critical Area Law.' This hierarchal statement is not correct. As we observed earlier in our discussion of *White v. North*, *supra*, the other factors of a variance ordinance, apparently including the 'harmony' factor here, provide illumination for the primary unwarranted hardship analysis.

"Second, the Commission argues that the Board's finding that the path is in harmony with the spirit and intent of the Zoning Ordinance is arbitrary and capricious. The foundation of *its argument is that, when viewed with a broader perspective and considered in conjunction with the impact of other impervious structures within the buffer, granting the variance would violate Talbot County's intent to protect its Critical Areas. The Commission's argument in this regard is too extreme. With its logic, no variances would ever be granted for fear that, one day, they could have a negative cumulative effect on their environs. In our opinion, the intent of the Zoning Ordinance is aimed at the cautious and thoughtful consideration and, where appropriate, granting of variances within the Critical Area on a case-by-case basis. Under Talbot County law, such variances are appropriate when their applications meet the Critical Area criteria and, where necessary, create reasonable accommodations for the needs of disabled citizens.*

"Although the Mastandreas' paths did create some 5000 square feet of new impervious surface area within the buffer, the evidence indicated that the brick-in-sand path was actually three times as permeable as the surrounding natural lawn, and that much of the potential increase in runoff from the other pertinent pathways was mitigated by landscaping. The Board's conclusion that these extensive mitigating factors do not impact adversely fish, wildlife, or plant habitat and are in harmony with the Zoning Ordinance's intent was supported by the record evidence. Fur-

thermore, the Board's conclusions regarding these mitigating factors are in accordance with Bill No. 741, being 'environmentally neutral' and not 'substantially impair[ing]' the intent of the variance ordinance."

Id. at 141–42, 760 A.2d at 695–96 (citations omitted)(footnote omitted)(emphasis added). *Mastandrea* clearly illustrates the illogical result that necessarily follows an overly generalized cumulative impact argument. Once the Board accepts that the cumulative impacts of further development within the Critical Area reaches a point where it would harm the environment,[23] no variance could be granted in the future, in essence eliminating the need for § 125–35 through § 125–38 of the County Code. We do not interpret provisions in a way that would effectively render other provisions of the Code "superfluous or nugatory." *Mid–Atlantic Power Supply Ass'n v. Public Service Comm'n of Maryland,* 361 Md. 196, 204, 760 A.2d 1087, 1091 (2000). Under respondent's rationale, once the Board determined a particular project had, or would exceed the Commission's cumulative impact assessment, the Board would be precluded from issuing any future variances

---

**23.** A more illustrative example would be to compare the cumulative impact argument to the filling of a bucket, *i.e.,* the Critical Area, with water, *i.e.,* new development within the Critical Area. The agencies, in essence, are, under this concept, "filling" the Chesapeake Bay Critical Area each time they approve a variance allowing development in the Buffer. Once the "bucket," according to the Commission, is filled to the top or is overflowing, no more "water" can be added. Similarly, once the cumulative negative impacts of all development in the Chesapeake Bay Critical Area reach a point where the Commission argues, and the agencies agree, that those impacts are such that they are the determinative factor in the denial of a variance request, the Commission is essentially finding that the entire area of the Chesapeake watershed can no longer support further development. The entire Critical Area would then be precluded from any further variances, as the "bucket" would be full of "water." In this way the Commission could close one river watershed after another or the entire Chesapeake region to any future waterfront development that intrudes upon the Buffer. Given this State's long tradition of utilization of waterfront land for wharves, landings, hunting, dockage, and the like, such drastic steps of closing down development in watersheds should come directly from the Legislature, which is better able to assess the costs, if any, of the wholesale denial of uses throughout watersheds.

throughout the entire Chesapeake watershed. We do not believe that the Legislature intended the Commission to have such power. While the general concern for the condition of the Chesapeake Bay and how land use broadly impacts that condition may be appropriate justification for adopting the regulations in the first instance, an individual application for a variance recognized under those regulations deserves a specific cause and effect analysis as to how, if at all, such proposal may contribute to adverse effects.

In this case, it is clear that the Board relied on, in part, the cumulative negative impact theory proffered by the Commission that was specifically rejected in *Mastandrea*. The Board, in its discussion on the possible environmental adverse effects of the variance request, said, "The witnesses also testified about the cumulative negative impact on the Bay caused by small amounts of development on numerous shoreline properties." The Board's decision was also improperly influenced by the Commission's expert, Ms. Chandler, during her testimony at the hearing. Some of that testimony went as follows:

"Q[uestion of petitioner's counsel]. *And you referred to cumulative impacts?*

A[nswer if Ms. Chandler]. *Yes.*

Q. Have you determined and are you able to quantify any adverse impact of these particular six buildings on any aspect of water quality in either ground water or the adjacent stream waters of the tributaries of the Nanticoke River?

A. *The whole idea of cumulative impact is not to look at each specific little thing. It's the idea that over time—*

Q. No, that wasn't my question.

A. *—it causes an effect.*

Q. My first question, though, is have you determined whether and have you done any testing or have any quantifiable way to show that these buildings have caused any increased levels of pollutants, nutrients or toxins to the base system?

A. I have not conducted any studies.

Q. Nor do you have any such data?

A. I know that there's 33—3370 square feet of less area of infiltration and for habitat.

Q. That's correct. The question, though, is do you have anything from which you can show or demonstrate that that 3300 square feet has caused an increase in the levels of pollutants, nutrients and toxins to the base system?

A. No.

Q. Okay. All right. Now, then, let's look at what the statute says.... It doesn't talk about just cumulative impacts, does it? Doesn't the word cumulative impacts refer to human activities that have caused increased levels of pollutants, nutrients and toxins?

A. It states the cumulative impacts of human activity, yes, you're right.

Q. Okay. So only those ... activities that have caused increased levels of pollutants, etc., are the concern that brings them within this umbrella of cumulative effects?

A. *No, it's the cumulative effect that causes the pollutants to have effects. It's ... the assemblage of all—I mean, if there were ten million of these cabins, that would be cumulative effects, but we don't have to look at this one little, this one island when you're talking about cumulative effects.*" [Emphasis added.][Alteration added.]

This testimony clearly furthers, without any empirical data, an argument that petitioner's cabins would breach an undefined cumulative impact threshold created *sua sponte* by the Commission, and, thus, for that reason, would be detrimental to the Chesapeake watershed. Logically, any future projects would necessarily be beyond whatever threshold the Commission is attempting to set. Cumulative impact arguments, moreover, have been disregarded as irrelevant to the specific finding of an unwarranted hardship in a specific case, such as in *Mastandrea.* As a result, those arguments should have been disregarded and not relied upon by the Board in this

case, or any specific case.[24] To use this testimony in its consideration of petitioner's case constituted another error of law.

In addition, respondent's cumulative adverse impact argument may not even be reliable in this case. Petitioner supplied the Board with specific scientific and observatory data illustrating the minimal, if any, environmental adverse impact resulting from the cabins proposed in the variance request at issue.[25] Petitioner was in the unique position to gather real data, as opposed to mere speculation, with respect to the issue of environmental harm from rain run-off from the impervious surface of the cabin roofs because the development he was requesting via the variance was already at least partially

---

**24.** As we have indicated, the decision whether the cumulative impact of development in a watershed has reached the point where all future development in buffer zones in the Chesapeake Bay Critical Area is to be absolutely prohibited is a decision for the Legislature or as it may be proven by evidence received in a specific case. We do not perceive that the Legislature has delegated (or could even delegate) such far reaching power to the Commission. Even then, such a permanent decision would be subject to review under constitutional provisions relating to unconstitutional takings.

**25.** Petitioner's expert, Mr. Launay, testified that he performed soil surveys when he said:

> "one of the things I took a look at is before going to the site, we took a look at the County soil survey to determine what soil series had been mapped on the property, and the site is basically as mapped by the USDA soil survey as Galestown loamy sand with a clay substratum with a zero to 5 percent slope ... that's important for a number of reasons, because that type of soil is a very well drained upland type soil with a very extremely high ability for permeability. In other words, to absorb potentially any run-off from the rooftops or from the small structures that perhaps Mr. Lewis constructed on the site.
> "... we performed a couple of soil borings to confirm the nature of and correctness of the County soil survey and found that to be generally correct."

Mr. Launay also observed that the buildings were constructed of natural material, thus no pollutants would be injected into the area. Additionally, he testified to the lack of excavation performed by petitioner and the general lack of any erosion, ditches or pathways created by rain run-off from the roofs.

constructed.[26] The Commission and other opposing witnesses,
provided little or no data [27] revealing any actual harm that
petitioner's camp would present to the surrounding environ-
ment. In fact, when Ms. Chandler was specifically asked
about whether she conducted any tests on the site, she an-
swered in the negative.[28] Ms. Chandler's conclusions that the

---

**26.** We note, however, that this is a unique case. We do not condone
the construction, without permits, of any structure within the Buffer in
violation of the law. Ignorance of the law is no excuse. Petitioner was
not justified in clearing the understory, cutting down trees and building
within the Buffer. He should have applied for permits in the first
instance. Nonetheless, petitioner amended his variance request origi-
nally purporting to move a majority of his camp outside of the Buffer
*only at the suggestion of his environmental experts,* who the County had
suggested he retain and who believed that the buildings would have less
of an environmental impact if left in their current location rather than
being located outside of the Buffer. As the physical property in which
he was building, as well as the entire circumstances of this request, are
unique, coupled with the fact that petitioner argues that he would be
entitled to the variance regardless of whether the cabins had been built,
we have treated this variance request as if the cabins were not on
Phillips Island. That is the same position the Board stated it was
taking.

**27.** Evidence of the cutting of trees and understory was produced. The
same testimony also produced evidence that the understory had begun
to recover and would likely, coupled with petitioner's proposed mitiga-
tion, become enhanced. The Commission and petitioner do not dispute
this evidence.

**28.** In fact, Ms. Chandler's testimony regarding the potential for the
camp to inject toxins into the system resulted in the following dialogue:
 "Q[uestion of petitioner's counsel]. And we don't have any con-
crete or asphalt driveways or sidewalks on the site, do we?
A[nswer of Ms. Chandler]. No, we have a lot of treated lumber.
 Q. Treated lumber? Where is that?
 A. All the cedar shakes, I'm sure they're treated with something.
 Q. Do you know whether they're treated?
 A. No, but -
 Q. Okay. Did you hear Mr. Launay testify that they were natural
cedar siding and natural cedar shakes roofing?
 A. Well, they seem to be very regular for being natural. They
were in the same shape, size, everything, so they're not completely
natural.
 Q. You mean because they're cut the same size or shape?
 A. And I'm sure they're treated with something.
 Q. Like what?
 A. Chemicals that help protect it from, from degrading in the
environment over time.
 Q. But that, that is your speculation?
 A. Yes." [Alteration added.]

camp would be harmful to the area were lacking any significant factual bases. They were grounded, admittedly, more in speculation than in hard fact and are thus instructive as to her lack of ability to rebut petitioner's experts.

Petitioner also claims that the Board erred as a matter of law in failing to consider *all* of the criteria listed within § 125–36. He argues that *White* requires the general consideration of all of the criteria within the county's code in denying a variance request. Respondent argues that petitioner failed to prove that those factors were generally met, and also that:

> "The Board had no duty to make separate findings on each one of the remaining Wicomico County variance standards. Once the Board found that Mr. Lewis failed to prove an unwarranted hardship, the Board could have stopped its analysis."

This is a total misunderstanding of our holding in *White*. In order to determine whether an unwarranted hardship exists, the Board must generally consider all of criteria of the County Code. It is only after all of the factors are considered that the Board can discern whether petitioner generally met the criteria of § 125–36.[29] While the Board need not find that the applicant satisfies each and every criterion for it to grant the applicant's variance request, or, in the alternative, that it find

---

29. As we previously discussed, *supra*, we note that in *White* we stated that:

> "The specific factors that must be considered cannot be construed individually to overrule a finding of unwarranted hardship any more than they could overrule a finding of an unconstitutional taking of one's property. The individual provisions that must be considered are part of the entire matrix that defines what information is necessary to reach a finding as to the existence or nonexistence of an unwarranted hardship."

*White*, 356 Md. at 50–51, 736 A.2d at 1083. This is not meant to stand for the proposition that the Board need not consider any additional factors once it determines there is no unwarranted hardship. For the unwarranted hardship determination to be made in the first instance, *all* of the factors must necessarily be considered, although the Board need not find the factors to be all positive to grant the request, or all negative to deny it. A balance of the "entire matrix" is appropriate.

negative factors for each factor in denying the request, the Board should, at the very least, discuss, on the record, each § 125–36 criterion before making its ultimate unwarranted hardship determination.

 In the case *sub judice,* the Board did not make specific findings in its Findings of Fact and Resolution of Decision with respect to all of the Code's § 125–36 criteria. It should have done so. The first factor in which there is no specific finding is in respect to the unique character of the area in question, § 125–36(A), although there is substantial evidence on the record regarding that criteria. The Court of Special Appeals defined unique in terms of Critical Area variance proceedings in *North v. St. Mary's County,* 99 Md. App. 502, 514, 638 A.2d 1175, 1181 (1994), when that court said:

> "In the zoning context the 'unique' aspect of a variance requirement does not refer to the extent of improvements upon the property, or upon neighboring property. 'Uniqueness' of a property for zoning purposes requires that the subject property have an inherent characteristic not shared by other properties in the area, *i.e., its shape, topography,* sub-surface condition, environmental factors, historical significance, access or non-access to navigable waters, practical restrictions imposed by abutting properties (such as obstructions) or other similar restrictions. In respect to structures, it would relate to such characteristics as unusual architectural aspects and bearing or party walls." [Emphasis added.]

*See also, Cromwell v. Ward,* 102 Md.App. 691, 721, 651 A.2d 424, 439 (1995)(stating, "a property's peculiar characteristic or unusual circumstances relating only and uniquely to that property must exist in conjunction with the ordinance's more severe impact on the specific property because of the property's uniqueness before any consideration will be given to whether ... unnecessary hardship exists"). As the Board never made a specific finding as to whether it considered petitioner's land unique for the purposes of this zoning matter, it committed legal error. The record is replete with facts

describing the island's shape and topography that bear on this issue. In fact, one of the County's staff planners stated, "We do recognize that the configuration of the island is a unique situation and that the area outside the Buffer equals 10,073 total square feet out of a 5.3 acre island." Instead, as we previously discussed, the Board and later, respondent, focused not upon petitioner's need for a variance because of the uniqueness of island, but upon the notion of self-induced hardship.

 Consideration of the criterion that petitioner's variance request was consistent with the county's zoning code and comprehensive plan, § 125–36(G), was similarly absent from the Board's opinion. While the apparent failure to consider this factor was error, whether it was satisfied is best left for the expertise of the Board, discussed *infra.*

 In sum, we have held that "where an administrative agency's conclusions are not supported by competent and substantial evidence, or where the agency draws impermissible or unreasonable inferences and conclusions from undisputed evidence," *Stansbury,* 372 Md. at 184, 812 A.2d at 319, or where an administrative agency's decision is based on an error of law, we owe the agency's decision no deference. *Belvoir Farms,* 355 Md. at 267–68, 734 A.2d at 232. The Board in the case *sub judice* clearly and unequivocally utilized incorrect standards of law throughout its Findings of Fact and Resolution of Decision denying petitioner's variance request; that decision was thus arbitrary and capricious. Given the substantial and numerous errors of law on which the Board based its decision, we direct the Circuit Court to vacate the finding of the Board. We have said:

> "Generally, when an administrative agency utilizes an erroneous standard and some evidence exists, however minimal, that could be considered appropriately under the correct standard, the case should be remanded so the agency can reconsider the evidence using the correct standard....
>
> "This general rule regarding remand is especially applicable when the statute authorizing the administrative action

includes the requirement that the agency consider factors of a legislative or administrative nature. . . .

"In the case *sub judice*, had the Board *declined* to grant the variance at issue, and had the circuit court then found that the Board's action in not granting the variance was arbitrary and capricious because the Board had applied the wrong legal standard, the court could not have granted a variance sua sponte, the consideration of which had never been subjected to the proper standard by the administrative agency. Ordinarily, courts cannot either grant or deny variances. In those circumstances, the circuit court would have the power to overrule the denial of the variance, but it would have to remand the matter to the agency for further consideration using the proper standard. The same holds true for the converse situation if the Board uses the wrong standard in granting a variance; the matter must be remanded for further consideration by the Board using the proper standard."

*Belvoir Farms*, 355 Md. at 270–72, 734 A.2d at 234–35 (footnote omitted). In light of the fact that there is some, albeit minimal, evidence in opposition to petitioner's variance request proffered by respondent in the context of the applicable standard, we shall order a remand of this case to the Board for further review consistent with the standards set forth in this opinion.

### C. Guidelines on Remand

On remand, the determinative question in the case *sub judice*, as previously mentioned, is not whether petitioner's property is subject to any reasonable and significant use without being granted a variance, but is a question of whether the *requested variance* is reasonable in light of the general findings in relation to the criteria listed in § 125–36. Once that reasonableness determination is made in light of the § 125–36 criteria,[30] the Board may then proceed in considering

---

30. The undisputed facts in this case indicate that 5.06 acres of the 5.30 acres of Phillips Island lie within the Buffer zone. More than ninety-

the conditions outlined in § 125–38. Therefore, if it is determined that the specific six cabin hunting camp proposed is a reasonable and significant use of Phillips Island, the Board then may consider whether that reasonable use is the minimum variance needed in light of the factors of § 125–38(B)(1) through (6). As we deem it necessary to order a remand to the Board for these considerations, we shall not specifically address each of the Board's factual findings.

## IV. Conclusion

In conclusion, we vacate the Wicomico County Board of Zoning Appeals's decision to deny petitioner's variance request to build a hunting camp within the Chesapeake Bay Critical Area Buffer. Although we normally defer to an administrative agency's decision regarding the facts of a hearing, we do not defer to the agency when it has committed an error of law. Here, in its decision written by respondent, the Board committed several errors of law in its application of this Court's recent opinions of *Belvoir Farms, White* and *Mastandrea.* We order a remand of this case to the Board for reconsideration of petitioner's variance request in light of the standards and guidance set forth in this opinion.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED AND THE CASE IS REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY AND REMAND THE CASE TO THAT COURT WITH FURTHER DIRECTIONS TO VACATE THE ADMINISTRATIVE DECISION AND TO REMAND THE CASE TO THE WICOMICO COUNTY BOARD OF ZONING APPEALS FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS IN THIS**

---

five percent of the Island is within the Buffer. The total footprint of the proposed camp within the Buffer area constitutes approximately 1.5 % of the island's Buffer. In *Mastandrea,* 4% of the buffer area was being utilized.

COURT AND IN THE COURT OF SPECIAL APPEALS
TO BE PAID BY RESPONDENT.

RAKER, WILNER and BATTAGLIA, JJ., Dissent.

Dissenting opinion by WILNER, J., in which RAKER and
BATTAGLIA, JJ., join.

In 1984, after years of study and debate, the Maryland
General Assembly took decisive action to protect this State's
most valuable natural resource—the Chesapeake Bay and its
tributaries. Although more than 30 bills were enacted in that
session to ameliorate, and hopefully reverse, environmental
assaults upon the Bay, the flagship and most comprehensive
law was Chapter 794, which created the Chesapeake Bay
Critical Area Protection Program.

In enacting that program, the Legislature made certain
findings that it felt important enough to express in the law
itself. It declared in § 8–1801(a) of the Natural Resources
Article, among other things, that:

The Chesapeake Bay and its tributaries are natural re-
sources of great significance.

The shoreline and adjacent lands constitute a valuable,
fragile, and sensitive part of this estuarine system, where
human activity can have a particularly immediate and ad-
verse impact on water quality and natural habitats.

The capacity of these shoreline and adjacent lands to with-
stand continuing demands without further degradation to
water quality and natural habitats is limited.

The quality of life for the citizens of Maryland is enhanced
through the restoration of the quality and productivity of
the waters of the Chesapeake Bay and its tributaries.

The restoration of the Chesapeake Bay and its tributaries is
dependent, in part, on minimizing further adverse impacts
to the water quality and natural habitats of the shoreline
and adjacent lands.

The cumulative impact of current development is inimical to
these purposes.

and

There is a critical and substantial State interest for the benefit of current and future generations in fostering more sensitive development activity in a consistent and uniform manner along shoreline areas of the Chesapeake Bay and its tributaries so as to minimize damage to water quality and natural habitats.

Upon those findings, which were re-enacted and thus reconfirmed in 2002, the Legislature stated as its purpose, "[t]o establish a Resource Protection Program for the Chesapeake [Bay] . . . and [its] tributaries by fostering more sensitive development activity for certain shoreline areas so as to minimize damage to water quality and natural habitats." In striking down the Board's determination in this case, the Court ignores those legislative findings, misconstrues and misapplies the regulations and local laws adopted pursuant to the statute, and seriously undermines this vital legislative program. With respect for my colleagues who join in the majority Opinion, I dissent.

The Resource Protection Program is a cooperative one between the State and local governments. The law created the Critical Area Commission, with authority to adopt regulations and criteria that would implement the stated goals of the program, and charged the counties within the defined critical area with developing and implementing local programs consistent with standards expressed in the law and those promulgated by the Commission. Several of those regulations are important here. In COMAR 27.01.02.02, the Commission recognized and defined three types of development areas— intensely developed areas, limited development areas, and resource conservation areas. Development was to be limited in the resource conservation areas, which were the most environmentally sensitive areas and were chiefly designated for agriculture, forestry, fisheries activities, other resource utilization activities, and habitat protection.

One of the program elements stated in the law itself was the establishment of buffer areas along shorelines (§ 8–1808(c)(6)).

In COMAR 27.01.09.01A, the Commission defined a "buffer" as "an existing, naturally vegetated area, or an area established in vegetation and managed to protect aquatic, wetlands, shoreline, and terrestrial environments from man-made disturbances." In COMAR 27.01.09.01C, the Commission required the local subdivisions, in developing their critical area programs, (1) to establish a minimum 100–foot buffer landward from the mean high water line of tidal waters, tributary streams, and tidal wetlands, (2) to maintain the buffer in natural vegetation, and (3) except for water-dependent facilities, not to permit new development activities, including structures and other impervious surfaces, within the buffer.

Finally, as relevant here, in COMAR 27.01.11.01, the Commission required the counties, in their local programs, to make provision for variances to the Commission's substantive criteria where, "owing to special features of a site or other circumstances, local government implementation of [the Commission's regulations] or a literal enforcement of provisions within the [county's] Critical Area program would result in unwarranted hardship to an applicant." The regulation set certain minimum requirements for the local variance program but specifically allowed the counties to establish additional and more restrictive standards for the granting of variances, consistent with the intent and purposes of the Commission's regulations and the Critical Area program.

The land at issue here lies in Wicomico County, which is within the defined critical area. Wicomico County adopted a local critical area law consistent with the State law and with the Commission's regulations. The county program was approved by the Commission, and, as no complaint is made here that it is, itself, invalid in any way, it controls this case.

In conformance with COMAR 27.01.09.01C, the county law established the required buffer (Wicomico County Code, § 125–7) and, except for water-dependent facilities, prohibited new development activities within the buffer unless a buffer exemption was granted by the County Council. *Id,* § 125–9. The local law defined new development activities as including

"clearing of existing natural vegetation" and the "erection of structures . . . or other impervious surfaces." In conformance with COMAR 27.01.11.01, § 125–35 permits the County Board of Zoning Appeals to grant variances where, owing to special features of a site or other circumstances, a literal enforcement of provisions would result in unwarranted hardship.

The law limits the Board's ability to *grant* such a variance, although not to *deny* one. Section 125–36 provides that variance requests in a critical area district may not be *granted* unless the decision is based on certain enumerated criteria, including:

"A. That special conditions or circumstances exist that are unique to the subject property or structure and that a strict enforcement of the provisions of this chapter would result in unwarranted hardship which is not generally shared by owners of property in the same land use management areas . . . of the Critical Area District.

B. That strict enforcement of the provisions within the Critical Area District would deprive the property owner of rights commonly shared by other owners of property in the same management area within the Critical Area District.

C. That the granting of a variance will not confer upon an applicant any special privilege that would be denied to other owners of like property and/or structures within the Critical Area District.

and

D. That the variance request is not based upon conditions or circumstances which are self-created or self-imposed . . . .

The land at issue here consists of two parcels, both of which are within the critical area. The western parcel, of just under 219 acres, borders the Nanticoke River on the north and a tributary of that river on the east. The Nanticoke flows directly into the Bay. The eastern parcel, comprising just under 77 acres, is separated from the western part by that tributary. Both parcels are within a resource conservation area. The entire western parcel and all but three areas of the eastern parcel, comprising a total of 7.23 acres, consists of

marshland. The largest of the "upland" areas, comprising 5.30 acres, is known as Phillips Island. That area is, or at least was before Mr. Lewis went at it, totally wooded, with mature oaks and loblolly pine. Ninety-five percent of that area—5.06 acres—is within the 100 foot buffer. Absent a properly issued variance, the clearing of vegetation and the construction of non-water-dependent structures within that area is absolutely prohibited.

When Lewis bought the property in April, 1999, the only man-made improvements on it were a boat pier, a storage building on the Phillips Island area, and approximately 12 duck blinds. He bought the property, he said, for occasional overnight or weekend hunting and fishing—not as a residence, not as a commercial enterprise. Oblivious to virtually every requirement of Federal, State, and local law, Lewis promptly began destroying vegetation and constructing buildings and other improvements on the property, all without a permit, all without notice, all in secret, all illegally. The Board of Zoning Appeals found the following uncontested facts:

"After purchasing the property, Mr. Lewis hired a contractor to build six buildings on the island. Mr. Lewis also had a well dug and a pier constructed on the island. One of the new buildings, a structure of approximately 1,600 square feet, is located 58.79 feet from the edge of tidal wetlands, and this building contains a kitchen and bath. Three of the remaining buildings, smaller in size, are intended for sleeping facilities, and one of these contains a bathroom. The fifth building was intended to be a bathhouse, and the last building was intended for storage of equipment. Five of the six buildings are located entirely in the 100–foot Critical Area Buffer, and the sixth building is located partially in the Buffer. Neither Mr. Lewis nor his contractor sought or obtained any state, federal, or local permits for any of the site preparation or construction activity. Testimony and exhibits at the hearing established that this construction occurred during summer and fall of 1999."

A site visit in July 2000 by a Department of Natural Resources habitat manager revealed that "a lot of vegetation

had been removed." The county Planning Office reported that "almost all groundcover and understory has been removed from the interior of the island."

Eventually, agencies from all three levels of Government discovered what Lewis was doing. The U.S. Army Corps of Engineers and the Maryland Department of Environment informed him that construction of the pier without proper permits was in violation of Federal and State law, and the county Planning Office informed him that the construction activity violated several sections of the county code. In April, 2000, the county attorney notified Lewis that the development activity was in violation of Chapters 117 and 125 of the county code (building without building permit and failure to obtain critical area certificate of compliance). That same month, the county Health Department informed him that the well, already completed, was in violation of Maryland health regulations. He was ordered to stop all further activity. The problem with the pier was corrected in June, 2000. Lewis was forced to abandon and seal the well.

Lewis's initial response was that he did not believe that he needed any permits, as he did not anticipate receiving any county services. Faced with the prospect of enforcement actions, however, he ceased construction and applied for the necessary permits and variances.

Notwithstanding Lewis's blatant defiance of Federal, State, and local law, the county attempted to work with him so that he could develop the property as he wished, but in compliance with applicable law. A major problem was a State Health Department requirement of a 10,000 square foot area, not within the buffer, for a sewage disposal system. Only 10,463 square feet of Phillips Island were not in the buffer. The county was able to persuade the Health Department, in light of the seasonal and limited use intended to be made of the property, to reduce the sewage disposal requirement to 5,812 square feet, which allowed Lewis to relocate at least three and possibly four of the six buildings to a non-buffer area. Lewis initially agreed, and submitted an application for variance that

showed four buildings—three of the smaller cabins and the storage building—outside the buffer and only two within it. It is entirely possible that a variance based on that plan, despite opposition from the county critical area staff, may have been approved. Lewis might have had his six buildings and his full intended use of the property, without any serious environmental degradation.

Having filed his application, Lewis began making arrangements to move some of the buildings in advance of any approval of the application. The county suggested that he defer until after a scheduled meeting, because the locations he chose might not be the ones approved by the zoning authority, and the staff wanted to avoid his having to move the buildings twice. Lewis instead consulted two environmental consultants who advised him to leave the six illegally constructed buildings where they were. On that advice, Lewis filed an amended plan that left all six buildings intact. Instead of seeking a variance for just two buildings, he now claimed a right to have all six in the prohibited buffer.

It is true, as the Court states, that Lewis's hired experts asserted that leaving the buildings where they were was more environmentally sound than relocating them. There was much evidence to the contrary, however, and it was the contrary evidence that the Board of Zoning Appeals credited. The Court spends several pages summarizing the testimony of Lewis's hired experts, but, in light of the Board's findings, that testimony, to me, is irrelevant at this point. It was simply not found persuasive. Mr. Dwyer, of the county planning office, testified that, had Lewis consulted the planning office before proceeding with construction, "we may have been able to redesign or design the project to avoid the need for a variance or at least to limit the amount of variance needed for the impact to the buffer." That conclusion was also stated in the report and recommendations of the county critical area staff. It was highlighted as well in the formal recommendation of the Critical Area Commission:

> "[A]ny variance should be the minimum necessary to provide relief. If the applicant had followed the proper proce-

dures, the development would have been designed to minimize impacts to the protected 100–foot Buffer and perhaps eliminate the need for a variance entirely."

Apart from evidence that the variance requested was not needed—that, even at the time of the hearing, at least some of the buildings could have been relocated to a non-buffer area—there was evidence that approval of the request would not be consistent with the critical area program. Lee Anne Chandler, a natural resource planner with the Critical Area Commission, not only testified but submitted a letter addressing each of the criteria for the granting of a variance. The Court, improperly in my view, denigrates her testimony and ignores entirely her letter on behalf of the Commission. The letter was in evidence, however, and, among other things, it states:

(1) Denial of the requested variance would not result in an unwarranted hardship because the project could have been designed to avoid the need for the requested variance. (2) The need for the variance is a self-created hardship:

> "[The applicant] went through great effort and expense to construct six buildings on the shoreline and dig a well on an island, accessible only at high tide by boat, without contacting any local permitting authority. All six buildings and the well are located within the Buffer, a designated habitat protection area where no new building is allowed except for water-dependent structures. The cabins and house are not water-dependent; thus the applicant created the need for the variance...."

(3) Approval of the variance would give Lewis a special privilege:

> "All property owners within the Critical Area are prohibited from disturbing the Critical Area 100–foot Buffer. In applying for permits, property owners work with County staff to understand the regulations and design development accordingly in a way that minimizes impacts to Critical Area resources. *Under no circumstances would development of the subject property be permitted as the applicant has already done.* If the variance is granted, the applicant

would reap the benefits of his unlawful actions." (Emphasis added).

(4) The 100–foot buffer is the cornerstone of the Critical Area Law. It functions to protect water quality and provide a transitional habitat between aquatic and upland communities. Those functions are compromised when clearing, construction, and other development occurs in the buffer and will continue to be compromised by the increased human activity.

(5) The variance would be contrary to the spirit and intent of the Critical Area Program:

> "The applicant has constructed six (6) buildings totaling 3670 square feet of impervious surface within the Buffer. Although it is literally impossible to measure impacts to water quality from these structures, it is obvious that each new impervious surface in the Buffer reduces the area available for infiltration and habitat. . . ."

Ms. Chandler, a professional planner who reviews several hundred Critical Area projects each year, had visited the site, and she described what she observed—destruction by Lewis of the understory on the island, piles of mulch and cut-up logs, and roofs with impervious surfaces. Russ Hill, a habitat manager for the Department of Natural Resources, also visited the site, and he confirmed Ms. Chandler's observations. Hill testified that removal of the vegetation would have a great effect on wildlife habitat. He stated that many bird and mammal species use or inhabit vegetated buffers such as that on Phillips Island for both nesting and feeding, and that, "[b]y removing the vegetation, you remove escape cover and nesting cover and also food sources for wildlife, whether it be the animals actually eating the plants or eating the insects that are feeding on the plants and also the berries and seeds that they produce." Don Jackson, from the Chesapeake Bay Foundation, testified that he saw approximately 114 newly cut tree stumps of five inches or larger in diameter and, in contrast to Lewis's testimony that he had cut only two trees, said that he counted over 100 trees that had recently been cut.

After listening to all of this testimony, for over six hours, the Board voted unanimously to deny the requested variance. In its written decision, it addressed at least four of the six criteria set forth in § 125–36 of the County Code for the *granting* of a variance and found that *none* of them warranted the requested variance. Mostly, however, it denied the request because it concluded that (1) a variance was not necessary to avoid any hardship to Lewis, who was free to use the property in its current form precisely as he had intended—for hunting and fishing—and as previous owners had used it, and (2) if there was any hardship to Lewis, it was self-created. The Board noted first that the 100–foot buffer is "of vital importance to the health of the Bay and is afforded strong protection from disturbance in the County ordinance." It pointed out that § 125–9 of the County Code prohibits new development activities, including clearing and the erection of impervious surfaces, in the buffer zone and that Lewis had both cleared natural vegetation and constructed impervious surfaces in that area. Noting this Court's decisions in *Belvoir Farms v. North*, 355 Md. 259, 734 A.2d 227 (1999), *White v. North*, 356 Md. 31, 736 A.2d 1072 (1999), and *Mastandrea v. North*, 361 Md. 107, 760 A.2d 677 (2000), the Board found:

(1) Lewis would not suffer any unwarranted hardship from denial of the requested variances because "he will continue to enjoy reasonable and significant use *of the Island* and the property without the requested variance." (Emphasis added). It noted that Phillips Island contained over 10,000 square feet that was not in the buffer and that "[a] reasonably-sized structure could be sited in this non-Buffer area for the occasional use of persons who hunt on the property." The Board stated that the property contained at least 12 waterfowl hunting blinds and had been used for hunting by previous owners for many years. It added that the requested variance was not the minimum necessary for reasonable use in any event.

(2) Strict enforcement of the buffer restrictions would not deprive Lewis of rights commonly shared by owners of other property in the county's resource conservation areas. The

Board acknowledged testimony regarding structures in the buffer zones of other properties but distinguished those situations on the ground that the uses there were associated with the residential use of the property.

(3) The variance request was based on circumstances and conditions that were self-created or self-imposed and that could have been avoided.

(4) There was conflicting evidence regarding the actual and potential environmental impacts of the construction and use of the six buildings. The Board summarized some of that evidence and concluded that it was "unable to find that the granting of this variance will not adversely affect water quality or adversely impact fish, wildlife, or plant habitat within the County's Critical Area District."

The Board made no express finding whether the variance would confer any special privilege on Lewis that would be denied to other owners of like property in the Critical Area District or whether the proposed variance was consistent with the county comprehensive plan. It does not appear that any question was ever raised about consistency with the comprehensive plan.

The Court directs that the Board's denial of the requested variance be vacated because (1) the Board used "impermissible legal standards" in determining that there was no unwarranted hardship, and (2) "the record contains little or no empirical data to support the Board's conclusions or to refute the studies and reports of petitioner's experts" and, as a result, the Board's decision is "arbitrary and capricious." In reaching those conclusions, the Court seems to complain that the Board did not consider all of the statutory criteria, that in examining whether denial of the variance would deny Lewis reasonable and significant use of the property, the Board erroneously considered the entire property rather than just the Phillips Island part of it, and that the Board erred in considering and giving any credence to Lewis's patently unlawful activity in constructing the six buildings in determining that his need for a variance was self-created.

The Court's decision rests largely on four recent cases, three involving Critical Area variances and one involving a traditional zoning variance. In the three Critical Area cases, the local board *granted* the requested variances, and what we had before us were challenges to the administrative decision. In *Belvoir Farms v. North,* 355 Md. 259, 734 A.2d 227 (1999), the variance permitted the applicant to construct 14 more boat slips at a community pier than were otherwise allowed by the critical area regulations. The Board granted the variance on the ground that denial of the request would create "practical difficulties" and, for that reason, would constitute an unwarranted hardship. We concluded that the Board had effectively equated unwarranted hardship with "practical difficulties," that "practical difficulties" was not the proper standard upon which to grant a critical area variance, and that the case therefore had to be remanded to the Board so that it could apply the correct standard.

To guide the Board, we pointed out that the "unwarranted hardship" standard applicable in the critical area variance context was less restrictive than the "denial of reasonable use" or "denial of a reasonable return" standards that had been applied in Constitutional taking cases. We held that the "unwarranted hardship" standard, and its similar manifestations, "are equivalent to the denial of reasonable and significant use of the property" and that "[w]hether a property owner has been denied reasonable and significant use of his property is a question of fact best addressed by he expertise of the Board of Appeals, not the courts." *Id.* at 282, 734 A.2d at 240.

In *White v. North,* 356 Md. 31, 736 A.2d 1072 (1999), the local board granted a critical area variance to permit residential owners to construct an in-ground swimming pool in their back yard. The applicants purchased an unimproved lot that had a gradual slope of less than 15%. The back of the lot led down to Martins Cove, a tributary within the Chesapeake Bay Critical Area. In grading the lot for their house, they pushed dirt from the excavation to the rear of the lot and thereby created a slope in that area exceeding 15%. Five years later,

they decided to build a pool, deck, and patio in the back. Had they built those accessories there before they re-graded that area, there would have been no problem, as the area was not within the 100–foot buffer. Under the county critical area law, however, where there was a contiguous slope of 15% or more, the buffer was extended to include all land within 50 feet of the top of the slope, and that brought the back of the lot within the extended buffer. Because the pool, deck, and patio clearly were impervious surfaces, that necessitated a variance.

On evidence that, because of restrictive covenants and other topographical features, there was no other place on the lot to build the pool, the Board granted the variance, concluding (1) that as a result of "unique physical conditions," there was no reasonable possibility of developing the lot in the manner the owners proposed without a variance and that a strict implementation of the critical area law would result in an unwarranted hardship, (2) because neighbors had pools in their yards, denial of a variance would deprive the applicants of rights commonly enjoyed by others, (3) the pool would not negatively impact the critical area because it would catch rainwater and lessen the natural runoff, and (4) the applicants did not create the hardship. *White* was a companion case to *Belvoir*, and we effectively vacated the Board's decision because, in finding a hardship, it had applied the wrong standard of "unique physical conditions" rather than the standard we enunciated in *Belvoir*. The "uniqueness" standard, we said, was not part of the county ordinance. We remanded for the Board to reconsider the application in light of *Belvoir*—whether denial of the variance would deprive the applicants of reasonable and significant use of their property. We confirmed that "[a]s long as evidence exists before the agency that would make its factual determination as to reasonableness and significance fairly debatable, its determination ordinarily should be upheld ... Generally, it is only when an agency's factual determinations are unsupported by substantial evidence that the courts may vacate an otherwise proper agency decision." *Id.* at 50, 736 A.2d at 1082–83.

We noted in *White* that the ordinance in question, and most local critical area ordinances, include "a list of other factors that must be considered with respect to the grant or denial of a variance," *id.* at 50, 736 A.2d at 1083. Citing the various criteria that were modeled on the requirements in COMAR 27.01.11, *supra,* we observed that, if total compliance with each of those standards was required, a variance would be nearly impossible and thus would present some serious "taking" questions. To avoid that, we concluded that those standards must be considered in the context of the entire variance ordinance, "to the end that, when interpreted as a whole, either they are or are not *generally* met." *Id.* We then added:

"Moreover, the essential determination is whether an unwarranted hardship exists. The specific factors that must be considered cannot be construed individually to overrule a finding of unwarranted hardship any more than they could overrule a finding of an unconstitutional taking of one's property. The individual provisions that must be considered are part of the entire matrix that defines what information is necessary to reach a finding as to the existence or nonexistence of an unwarranted hardship."

*Id.* at 50–51, 736 A.2d at 1083.

That statement needs to be applied with some care. COMAR 27.01.11.01 requires local programs to make provision for variances where, owing to special features of a site or other circumstances, literal enforcement would result in unwarranted hardship and it lists certain criteria that, at a minimum, the local plans must contain with respect to variances. One of those criteria is that the variance request not be based on conditions or circumstances which are the result of actions by the applicant. That is the foundation for the self-created hardship provision found in most, if not all, of the local critical area ordinances. Perhaps it is a matter of semantics, in the sense that, if the hardship claimed by the applicant is self-created, it is, *ipso facto*, not unwarranted, but if not viewed that way, then the self-created hardship criterion necessarily must stand on its own as an independent basis for

denying a variance. That, to me, has enormous significance, because once the Board, on substantial evidence, finds that the hardship claimed by the applicant as a basis for the requested variance was self-created, the Board need do no more in order to deny the variance. Upon that finding, there exists no basis upon which to grant the variance. The other factors, which are relevant only in determining whether a hardship exists in the first instance, then become irrelevant. It was at least an arguable issue in *White*, and, since the Board there had not applied the correct standard for determining hardship, remand was appropriate.

The third case, *Mastandrea v. North*, 361 Md. 107, 760 A.2d 677 (2000), also involved the granting of a variance—to construct a sloping brick-in-cement pathway from the applicant's house to a pier extending into Glebe Creek. The gradually sloping pathway was needed to accommodate the homeowner's child, who suffered from muscular dystrophy and was confined to a wheelchair. Because of the steep slope of the land, the pathway was necessary to provide access for the child to the waterfront. A variance was needed for that part of the path traversing the 100–foot buffer, and the Board granted it, finding, among other things, that as the pathway was the only means of access for the child, denial of the variance would deny her reasonable use of the property. There was no issue of the hardship being self-created, and our affirmance of the Board's decision rested on our conclusion that there was sufficient evidence in the record to support that decision.

With the caveat noted as to some of the language in *White*, it seems to me that these three cases mandate an affirmance of the judgment here. I find nothing in them that would support a reversal. The only case that might provide some support for the Court's unfortunate ruling is *Stansbury v. Jones*, 372 Md. 172, 812 A.2d 312 (2002) which itself was wrongly decided and should not even be followed, much less extended.

Turning to the Court's rationale in this case, the Court first holds that the Board used the wrong standard in determining

that there was no unwarranted hardship. That, it seems, rests on the conclusion that the Board looked at the hardship question in terms of the property as a whole, rather than that part of the Phillips Island area within the buffer. There are two problems with that ground. First, it is factually incorrect. The Board found that Lewis would "continue to enjoy reasonable and significant use *of the Island* and the property without the requested variance." (Emphasis added). Second, there is no basis in the State statute, the Commission's regulations, or the local ordinance for limiting the Board's focus only to the part of Phillips Island within the buffer. Section 125–36 of the county ordinance states that a variance request "shall not be granted" unless the decision is based on the stated criteria, the relevant one of which, in this context, is that "special conditions or circumstances exist that are unique *to the subject property* or structure and that a strict enforcement of the provisions of this chapter would result in unwarranted hardship which is not generally shared by owners of property in the same land use management areas." (Emphasis added). That criterion speaks of "the subject property," not just the piece of it that is within the buffer area.

Ignoring the language of the ordinance, the Court improperly extends, and therefore misapplies, what we actually said and held in *Mastandrea*. Keeping in mind that the Board there *granted* the variance upon a finding that the pathway provided reasonable access to the waterfront for the handicapped child and was a reasonable accommodation for her disability, we said that the Board "did not *have to consider* whether denying the variance would have denied the Mastandreas a reasonable and significant use of the 'entire' lot" (emphasis added) but was instead required to consider only whether, in light of their daughter's disability, they "would be denied a reasonable and significant use of the waterfront of their property without the access that the path provided." *Mastandrea*, 361 Md. at 136, 760 A.2d at 693. The real issue in *Mastandrea*, which we found unnecessary to address in the appeal, was whether the Board would have been required under the Americans With Disabilities Act to make such an

accommodation. It is evident that, whether or not the Board had that Act in mind, it clearly relied on the child's disability when it granted the variance. *Id.* at 126, 760 A.2d at 687.

It is impermissible, in my opinion, to stretch that statement, made in the context of the peculiar circumstances of *Mastandrea*, into a proposition that the focus in every case must be limited to the buffer area. One need only consider the implication of such a holding to understand its fallacy. If a lot contains ample non-buffer area on which to build the structure thought required to provide a reasonable and significant use of the property, the owner cannot demand the right to build that structure in a buffer area on the lot and insist that, in determining whether denial of a variance would constitute an unwarranted hardship, the Board look only at the buffer area. That is what the Court seems to hold, and that cannot be right.

The Court also finds that the Board's decision was arbitrary and capricious because the record contains "little or no empirical data to support the Board's conclusions or to refute the studies and reports of petitioner's experts." Where that test came from is a mystery to me. The standard we have always applied (until today) is whether "there is substantial evidence in the record as a whole to support the agency's finding and conclusions." *Board of Physician Quality Assurance v. Banks,* 354 Md. 59, 67–68, 729 A.2d 376, 380 (1999); *Mehrling v. Nationwide,* 371 Md. 40, 57, 806 A.2d 662, 672 (2002). In that regard (until today), we have followed the principle that "a reviewing court decides 'whether a reasoning mind reasonably could have reached the factual conclusion the agency reached'" and that it should "defer to the agency's fact-finding and drawing of inferences if they are supported by the record." *Banks,* 354 Md. at 68, 729 A.2d at 380–81; *Mehrling,* 371 Md. at 57, 806 A.2d at 672. We have also followed (until today) the rule that the court must review the agency's decision in the light most favorable to it, that the agency's decision is presumed correct, and that it is the agency's province to resolve conflicting evidence and draw inferences from that evidence. *Id.*

There is nothing in that traditional test that requires "empirical data" to support the agency's findings, and there is certainly no requirement that there be "empirical data" to refute evidence offered by the party having the burden of proof and persuasion. There was ample evidence in the record to demonstrate that Lewis would be able to enjoy the reasonable and significant use of his property, including the Phillips Island part of it, without the need for the variance he requested. Testimony and letters from both the county planning office and the Critical Area Commission documented that some of the buildings could be located outside the buffer zone—that it was not necessary to have all six in the buffer. Lewis simply threw the gauntlet down and insisted that he was entitled to have all six illegally constructed buildings remain where they were. Lewis bought the property to use for weekend or occasional hunting and fishing—the same use to which it previously had been put. There is no evidence in the record—none whatever—that even suggests, much less demonstrates, that six buildings in the buffer zone are required in order for Lewis to use the property for that purpose.

Finally, the Court wrongly dismisses Lewis's unlawful construction of the six buildings as a "red herring." It is not a "red herring" at all. The importance, which the Court blindly overlooks, is not just the illegality of what Lewis did, but in the uncontradicted evidence that, had he applied for the permits in advance, as the law required him to do, the project could have been revised at that point so that either a variance would not have been necessary or that the need for one could have been limited. There can be little doubt that, had Lewis applied initially for a variance for six buildings in the buffer, it would have been denied as unnecessary. Lewis built the structures and then demanded a right to retain them as a hardship. He should receive no reward for his unlawful behavior.

In its inexplicable effort to allow property owners such as Lewis to do whatever they wish on environmentally sensitive property, without regard to legal constraints or public policy, the Court throws established principles of administrative law

to the wind, misconstrues the relevant statutes and regulations, and views the evidence not in a light most favorable to the agency but in a light most favorable to the losing applicant. It is not only wrong in this case but sets a most unfortunate precedent.

Judges RAKER and BATTAGLIA have authorized me to state that they join in this dissent.

Filed: October 10, 2003

*ON MOTION FOR RECONSIDERATION*

PER CURIAM.

Respondent, the State Department of Natural Resources, Critical Area Commission for the Chesapeake and Atlantic Coastal Bays (the Commission), filed a Motion for Reconsideration regarding the Court's opinion in this matter filed on July 31, 2003.[1] In that motion, several principal arguments were advanced upon which we shall comment in denying the motion.

"1. Contrary to precedent of the United States Supreme Court and this Court, the Court [of Appeals] rejected the General Assembly's legislative findings that the cumulative impact of development harms the bay."

The Court did no such thing. The Court in the present matter, as well as in *Mastandrea v. North,* 361 Md. 107, 760 A.2d 677 (2000),[2] was not called upon directly to consider the accuracy, substance, or scope of vitality of the relevant legislative findings and declarations upon which the creation of the Commission and its powers was predicated. Rather, the Court noted in both cases that the Commission's misuse of

---

1. Certain non-parties who had not sought previously to participate as amici curiae on the merits (the governments of Anne Arundel, Carroll, Harford, Montgomery, and Worcester Counties, State Senator Roy P. Dyson, State Delegate Barbara A. Frush, and the Chesapeake Bay Foundation, Inc.) moved for recognition to file, as amici, their support for the Respondent's motion.

2. No motion for reconsideration was filed by the Commission (or anyone) following the filing of our opinion in *Mastandrea.* Moreover, the *Mastandrea* opinion spoke for a unanimous Court.

those findings and declarations in each case was not a substitute for adducing evidence that the respective variance proposals might "have a particularly immediate and adverse impact on water quality and natural habitats." Md.Code (1990 Repl.Vol., 2002 Supp.), Nat. Res. Art., Nat. Res. Art., § 8–1801(a)(2).

From the legislative inception of the Commission in 1984 through the most recent pertinent re-enactment in 2002, the Legislature's relevant "findings" regarding the conditions of and about the Chesapeake Bay have been substantively the same:

### § 8–1801. Declaration of public policy.

(a) *Findings.*—The General Assembly finds and declares that:

(1) The Chesapeake and the Atlantic Coastal Bays and their tributaries are natural resources of great significance to the State and the nation;

(2) The shoreline and adjacent lands constitute a valuable, fragile, and sensitive part of this estuarine system, *where human activity can have a particularly immediate and adverse impact on water quality and natural habitats;*

(3) *The capacity of these shoreline and adjacent lands to withstand continuing demands* without further degradation to water quality and natural habitats is *limited;*

(4) National studies have documented that the quality and productivity of the waters of the Chesapeake Bay and its tributaries *have declined due to the cumulative effects of human activity that have caused increased levels of pollutants, nutrients, and toxics* in the Bay System and *declines in more protective land uses* such as forestland and agricultural land in the Bay region;

(5) Those portions of the Chesapeake and the Atlantic Coastal Bays and their tributaries within Maryland are particularly stressed by the continuing population growth and development activity concentrated in the Baltimore–Washington metropolitan corridor and along the Atlantic Coast;

(6) The quality of life for the citizens of Maryland is enhanced through the restoration of the quality and productivity of the waters of the Chesapeake and the Atlantic Coastal Bays, and their tributaries;

(7) The restoration of the Chesapeake and the Atlantic Coastal Bays and their tributaries is dependent, in part, on *minimizing further adverse impacts to the water quality and natural habitats of the shoreline and adjacent lands;*

(8) *The cumulative impact of current development is inimical to these purposes; and*

(9) There is a *critical and substantial State interest* for the benefit of current and future generations *in fostering more sensitive development activity in a consistent and uniform manner* along shoreline areas of the Chesapeake and the Atlantic Coastal Bays and their tributaries so as to minimize damage to water quality and natural habitats. [Emphasis added.]

Patent in these findings is that the Legislature was commenting retrospectively as to the cumulative impact upon the Bay of existing development, thereby necessitating close scrutiny of individual future development proposals so that any particular immediate and adverse impact on water quality and natural habitat from each development was minimized. Of course, if no adverse impact was shown, nothing required minimization. Presumably because the Legislature was aware of constitutional implications were it to preemptively foreclose all future development in the areas tributary to the Chesapeake Bay (and being unwilling to sustain the financial costs of such a potential "takings" situation), it is equally clear from these findings that it was *not* the Legislature's intent that no development be permitted henceforth in areas tributary to the Bay. The necessary consequence of the tension between the legitimate environmental protective regulatory effort of the statute and the constitutional consequences of a "taking" leads to a case-by-case, quasi-adjudicatory process where *each* new development proposal is analyzed in terms of whether *it* would affect adversely the Bay, i.e., the variance process.

To the extent that the Court's opinions in the present case and *Mastandrea* address a "cumulative effects" argument mounted by the Commission, it was only to point out that the Commission, in lieu of adducing evidence as to how the respective variance proposals impacted adversely on water quality or natural habitats, misused the Legislature's retrospective-looking finding as to cumulative effects of past development over the entire drainage basin of the Bay as a substitute for any meaningful analysis on the Commission's part of the particular uses involved in the quasi-adjudicatory processes at issue in those cases.

This should not be misunderstood to mean that the Commission, or any one save the applicant in a variance case, has a legally cognizable burden to adduce evidence in support of its position. On the other hand, where an applicant, such as here and in *Mastandrea*, adduces competent and admitted evidence amounting to a *prima facie* case as to the required elements necessary to grant its application, opposing parties must accept a practical risk when they fail to produce any evidence, other than naked opinions, to the contrary. If, as was the case in *Mastandrea*, the administrative body making the decision is persuaded by the applicant's evidence,[3] and in the absence of evidence to the contrary, the obvious consequence is that it may be more likely that the decision-maker

---

**3.** In *Mastandrea*, the applicants adduced specific evidence that the bricks-in-sand pathway in question there was actually more permeable to rainfall than the six inch deep excavated "natural" clay subsoils underlaying the residential lawn disturbed by installation of the pathway. No habitat for wildlife was disturbed. 361 Md. at 116–117, 760 A.2d at 681–82. Rather than offer contradictory evidence, or even to cross-examine the Mastrandreas' expert witnesses regarding the studies they made that led to the foregoing conclusions, the Commission generally argued that the variance should not be granted because, when considered with the impact of other existing impervious structures within the Critical Area buffer in Talbot County ("the cumulative effects argument"), approval of the variance would violate Talbot County's intent to protects its critical areas. Rejection of the Commission's argument by the Talbot County Board of Appeals (and this Court) was the result. Neither rejection, however, represented repudiation of the Legislature's retrospective legislative findings, only the Commission misapplication of them in specific cases.

may find for the applicant. That is the risk the Commission takes when it fails to adduce evidence to rebut an applicant's *prima facie* case.

In the present case, the Commission essentially repeated its misplaced cumulative effects argument from *Mastandrea,* which, even when coupled with its witness's opinion testimony that was supported only by mere speculation, rather than facts, amounted to no contradictory evidentiary predicate vis à vis Lewis' *prima facie* case in support of his variance application. To be sure, there existed actual evidence in the record before the Wicomico County Board of Zoning Appeals introduced by other parties before that administrative agency opposing Lewis' application. It is that evidence, which the Board presumably will weigh against Lewis' evidence, when it reconsiders this matter on remand from this Court.

The Respondent/Movant then argues:

"2. The Court failed to follow its own legal precedents, by re-evaluating the evidence and usurping the role of the fact-finding agency. The Court further erred by mis-characterizing lay testimony as 'expert,' by ignoring the testimony of the State's expert on plant and wildlife habitat, and by failing to defer to the Board of Appeals' assessment of all the evidence presented in the six-hour hearing."

Initially, we note that we did not reverse the agency's decision and direct it to issue a variance. We merely vacated its decision, and remanded the case back to the agency for it to reconsider the request without utilizing improper considerations. We applied the precedents that existed at the time of the 2001 Wicomico County Board of Zoning Appeals's hearing in this matter. We found that the applicant had presented sufficient evidence from its witnesses, including its experts, that might have justified the issuance of a variance if improper considerations had not been taken into account. We note now, as we noted in the majority opinion, that one of the specific improprieties in this case was the acceptance by the Board of the general cumulative impact argument and its application *to a specific variance proposal thereby, in effect, closing an*

*entire watershed when the General Assembly had not delegated that power to the Commission,* **not that the public policy declaration as to cumulative impact from past development that serves as the stated justification for creation of the critical area legislative scheme as a whole was improper.** We were not asked in this case to consider the constitutionality of the Critical Area legislative scheme and the statutes then in effect, nor have we ever resolved such issues. Any assertion to the contrary is simply incorrect.

We did not ignore the evidence presented by the Movant and other parties before the Board. We merely held that the witnesses, including the experts, for the applicant had opined as to the lack of endangerment to the environment based upon actual site specific inspections of the subject property and that the witness offered by the Movant testified as to development in general, and then presented only conjecture as to the subject property. We held that conjecture was insufficient to rebut site specific fact based expert opinion. Even then, we merely remanded the case back to the agency. Generally, it is the function of this Court to review the evidence in matters calling for review of administrative agency actions. That does not change when the Commission is a party before the respective agency.

Respondent/Movant presents a third issue:

"3. The Court imposed on local jurisdictions a new and costly requirement to conduct empirical studies, produce reports, and present expert testimony in order to support denial of a variance to the local zoning laws."

We proposed no such requirement. What we held, as we have in other adversarial proceedings, is that when an applicant (or a plaintiff) presents evidence sufficiently favorable to him or her to meet the burden the applicant must meet, a generalized opinion "that wildlife will be harmed"[4] or "All the

---

4. Petitioner proposes a hunting camp. Hunting is permitted in Maryland. One of the purposes of a hunting camp is to kill ducks, geese, rabbits, squirrels, deer, i.e. wildlife.

cedar shakes, I'm sure they're treated with something,"[5] without any supporting evidence (site specific or otherwise), may not be sufficient to rebut an the applicant's prima facie case. Generally, when an applicant in an administrative proceeding presents evidence that, standing alone, sufficiently supports the granting of an application, protestants present evidence (as opposed to mere conjecture) to the contrary. That does not change just because one of the protestants is the Critical Area Commission. And in any event, this Court has not ordered that the application be granted. The agency's decision was vacated, and the matter remanded for further consideration.

The Respondent's/Movant's fourth issue is really twofold.

"4. The Court dismissed the illegal construction of hunting cabins in the sensitive 100–foot Chesapeake Bay buffer as a 'red herring,' even though the law clearly requires the fact-finder to consider whether the hardship from which the applicant seeks relief is self-imposed. By dismissing as not relevant the fact that Lewis built the cabins illegally, the Court condoned law-breaking, and encouraged future noncompliance.

"The Commission respectfully requests that the Court reconsider this decision which inexplicably throws into turmoil well-settled principles of administrative and zoning law. Alternatively, the Court should clarify that the decision is limited to the narrow circumstances presented by this case, and acknowledge that the cases upon which the decision rests were legislatively overruled in 2002."

We did not condone any illegal conduct. We addressed this case as it was presented before the agency. We noted on page 16 of our opinion how the agency addressed the case by quoting from the comments of a member of the Board. He said: "And the rest of my comments I'm going to make is in the context of that we, or I will be trying to view this and am

---

5. The expert admitted that she did not know whether the cedar shake shingles were treated.

viewing this as if the buildings were not already there." Moreover, the Board, while mentioning that the fact that if the buildings had to be moved, that move would be a self-created hardship, went on to decide the case as if the buildings were not there and as if the application was for new structures.[6] The Board's finding included:

".... [T]he Board finds that the Applicant will not suffer an unwarranted hardship without a variance for the six buildings because he will continue to enjoy reasonable and significant use of the Island and the property without the requested variance.... [T]he island contains over 10,000 square feet of land that does not lie within the Tidal Buffer. A reasonably-sized structure could be sited in this non-Buffer area.... Accordingly, the Board finds that denial of a variance ... will not deny ... the reasonable and significant use of the Island ... and that he will not suffer an unwarranted hardship."

We merely addressed the decision of the Board as it made it. More important, we noted in footnote 26 on page 45 of the majority opinion: "... we have treated this variance request as if the cabins were not on Phillips Island. That is the same position the Board stated it was taking." If the Board wanted to decide the case on the basis of the fact that the existing cabins were a self-created hardship, it should not have addressed the issue differently.[7] We merely resolved it the way it was presented.

Addressing the fourth issue further, obviously this case is limited to its own facts and the rather unique procedural posture of the case as it arrived before us, i.e. as if it was an application for proposed cabins. Moreover, we applied the law as utilized by the parties in this pre–2002 case. The Commis-

---

**6.** This may well be as a result of the interactions with various public entities as the application progressed.

**7.** A fair reading of the proceedings below, with the various interactions of officials and applicant and its experts, appeared to us, and still appears to us, to have been a situation where all parties addressed the application as if the cabins were proposed, as opposed to existing.

sion, in its prepared findings for the Board, purported to be applying the law as it existed in 2001.

Chapter 431 of the Laws of Maryland of 2002, the new law, as relevant to this issue provides:

*"SECTION 2. AND BE IT FURTHER ENACTED, That this Act shall be construed to apply only prospectively and may not be applied or interpreted to have any effect on or application to any variance application for which a petition for judicial review of a decision to grant or deny a variance under a local critical area program was filed before the effective date of this Act."*

Accordingly, in not applying the new statute in deciding the present case, we were complying with the dictates of the Legislature. It directed that we not apply the new statute to this case and we followed that direction.

To the extent that it is argued that we should nonetheless have applied the new statute, in the face of the Legislature's express prohibition that we not apply it in such cases, another problem also would exist. There was no challenge to the constitutionality of the applicable law as existing in 2001 when the variance was acted on by the local administrative body. To now apply, *sua sponte,* a new, presumably stricter, law to a prior application, when the new law says it does not apply, would create due process concerns.

**MOTION TO RECONSIDER DENIED, WITH COSTS.**

RAKER, Judge, dissenting.

I joined the well-reasoned dissent authored by Judge Wilner, filed on July 31, 2003. I continue to adhere to the views expressed therein.

WILNER, Judge, dissenting.

I do not, as a rule, write to protest the denial of a motion for reconsideration, even when I dissented from the original decision. Indeed, I cannot immediately recall any instance in my 26 years as an appellate judge when I have done so. If I have expressed my disagreement with the decision and set out the

reasons for it in a dissenting opinion, my point has been made, and if it remains unpersuasive to my colleagues, there is nothing more to do.

This case is different. This was not just a disagreement over a point of law. In my view, notwithstanding the explanations offered in the opinion denying the motion for reconsideration, the majority Opinion was deliberately designed, and, unless the General Assembly acts swiftly and decisively, may be effective, not only to dismantle the critical areas program but to seriously weaken fundamental zoning and land use controls generally.

This case has a triple significance. The first is in its substantive effect on those programs. The Court's Opinion is *not* a narrow one, as the Court now suggests, simply examining, in a neutral way, whether the evidence produced before the Wicomico County Board of Zoning Appeals was legally sufficient to support its denial of Lewis's belated demand to build six hunting cabins in a legally created buffer zone. It seems clear to me that both the holding of the Court and the language used to justify it attack the very heart of land use controls, and specifically the critical areas program. They are an invitation to the very kind of lawless behavior that occurred in this case—ignore the law, destroy the habitat and build where the law does not permit, do it all in secret, and then claim hardship.

Second, in its determination to cripple the critical areas program by overturning a perfectly rational and well-supported administrative decision, the Court has not just ignored, but has, in fact, mutilated, fundamental principles of administrative law well established in our case law and in the case law throughout the country. The unsupported and wholly unprecedented statements made by the Court regarding the need for "empirical evidence" to combat testimony offered by the party having the burden of proof which the agency simply found non-credible and unpersuasive will come back to haunt the Court in other administrative law cases, having nothing to do with land use issues. I expect that, when that happens, the

Court will quickly retreat and disavow what it has said in this case, but, in the meanwhile, it has thrown a major part of basic administrative law into a cocked hat. The Court continues to maintain that, if an applicant having the burden of proof produces evidence that is perhaps legally sufficient, the opponents must rebut that evidence, even when the agency finds that the applicant's evidence is unpersuasive. That is simply not the law. The applicant has the burden of both production and persuasion, and, even if he met the former in this case, he clearly did not meet the latter. Without explanation, the Court continues to ignore that very basic premise of administrative law.

The third significance is a jurisprudential one—a "political" one in the broad, non-partisan, sense of the term. The Court's decision purports to rest on three earlier decisions that (1) as noted in my earlier dissent, do not support the result reached in this case, and (2) in 2002, the General Assembly specifically declared, in duly enacted legislation, were no longer the law of Maryland. In confirming the findings it initially made in 1984, the Legislature declared that those decisions were "contrary to the intent of the General Assembly in enacting the Chesapeake Bay Critical Area Program" and that it was the Legislature's intent "to overrule these recent decisions . . . regarding variances to Critical Area regulations." Even if the substantive provisions of the 2002 law are not applicable to this case, the Court should not be extending those cases in light of the Legislative declaration that they were contrary to the General Assembly's intent. In relying on those cases, as though they were still valid, the Court, is in effect, thumbing its nose at the General Assembly. The issues before us were not Constitutional ones, although the Court now hints that some Constitutional defect may lurk somewhere. Lewis never claimed a Constitutional right to build six hunting cabins in a protected buffer zone, and, if, on the facts of this case, he did so, the assertion would carry the concept of *chutzpah* to a new plateau. The issues were ones of statutory construction and basic administrative and land use law, as to which the Legislature's pointed statement, made in statutory form, was entitled to respect and deference.

The motion for reconsideration filed by the Department of Natural Resources, formally supported by Anne Arundel, Harford, Montgomery, and Worcester Counties, the Chairs of the Legislature's Joint Committee on the Chesapeake and Atlantic Coastal Bays Critical Area, and the Chesapeake Bay Foundation, and no doubt being watched with both hope and alarm by virtually every person and organization knowledgeable and concerned about the health and viability of the Chesapeake Bay and its tributaries, gives the Court an opportunity to recognize that it was wrong—that it went too far, that its ruling is not only an embarrassment but may have caused great harm and will undoubtedly create unnecessary friction with the Legislature.

The motion should be granted. The Court should withdraw its Opinion, act responsibly, and affirm the judgment.

BATTAGLIA Judge, dissenting.

I do not join either the Court's opinion in denying the Motion for Reconsideration, nor Judge Wilner's dissent from the denial. I would grant the Motion for Reconsideration and set the case in for a hearing.